639 A.2d 228

MATTVIDI ASSOCIATES LIMITED PARTNERSHIP, et al.

v.

NATIONSBANK OF VIRGINIA, N.A.

No. 1327, Sept. Term, 1993.

Court of Special Appeals of Maryland.

April 7, 1994.

Roger C. Simmons (Edmund W. Law and Gordon & Simmons, on the brief), Frederick, for appellants.

William R. Naeher (Michele D. Lynch and Thompson, Hine and Flory, on the brief), Washington, DC, for appellee.

Argued before WILNER, C.J., and GARRITY and MOTZ, JJ.

MOTZ, Judge.

This is an appeal from the award of a large judgment by the Circuit Court for Montgomery County (McGuckian, J.) in favor of a bank and against a borrower and the guarantors of a loan made by the bank.

(i)

On November 8, 1988, Sovran Bank, N.A. (predecessor in interest to appellee, NationsBank of Virginia, N.A.) agreed to lend appellant, Mattvidi Associates Limited Partnership, $4,750,000 for the purpose of constructing two buildings in Waldorf, Maryland; all outstanding principal was to be repaid by November 8, 1990. The remaining appellants, Alan Landau, Peter Yeskel, Nathan and Pauline Wechsler, and various Wechsler trusts, guaranteed Mattvidi's repayment of the loan. The project fell several months behind schedule and it was impossible for appellants to secure permanent financing and pay off the bank's note when it matured on November 8, 1990. Appellants contacted the bank and indicated a desire to extend the loan. The bank and appellants negotiated as to terms of a loan extension during the fall and winter of 1990–1991. On February 7, 1991, pursuant to a request by the bank, appellants articulated the terms of their pending loan extension application in a formal, written proposal. The bank did not accept appellants' proposal; instead, the parties agreed on a different loan extension agreement, extending the loan until April 30, 1991.

Another proposal was submitted by appellants for a further loan extension based on different terms; it was not accepted by the bank but discussions continued between the bank and appellants. On August 19, 1991, the bank and all appellants executed a Pre–Workout Agreement formally allowing negotiations to go forward. In that document, appellants agreed, *inter alia,* "not to seek to admit as evidence, or as a basis for any claim against Lender, in any court of law ... any discussions undertaken ... pursuant to this letter agreement." Negotiations did continue for a short time, but ultimately the

bank gave notice of default in a letter dated September 20, 1991.

Six weeks later, on November 4, 1991, the bank filed this action in the circuit court; the complaint was accompanied by a motion for summary judgment. On January 24, 1992, appellants filed an opposition to that motion, asserting: (1) that they needed discovery to verify the amount of their alleged debt; (2) that the late charge sought by the bank was an unenforceable penalty; and (3) that the bank's claim for attorneys' fees should be limited to those reasonably and actually incurred. Appellants simultaneously filed their answer, which asserted that the Complaint failed to state a claim upon which relief could be granted and included a Rule 2–323(d) general denial; it also restated their late charge and attorneys' fees defenses. Appellants moved for partial summary judgment on the late charges. On February 5, 1992, the circuit court issued its trial date notice providing for: (1) the calendar call on March 24, 1993, (2) discovery to be concluded no later than 45 days prior to the calendar call or by February 7, 1993 and (3) trial to begin on April 5, 1993.

In an attempt to further continuing workout discussions, the parties mutually agreed on numerous occasions between January 29, 1992 and November 18, 1992 to postpone the hearing on their motions for summary judgment and to delay responses to discovery. In early December, 1992, the bank stated its intention to decline appellants' loan request and to prosecute this litigation; deposition notices were served by the bank, and it answered outstanding discovery requests propounded by appellants. On December 23, 1992, new counsel (appellants' third law firm) entered an appearance on behalf of appellants and moved for a continuance of the summary judgment hearing, which was then scheduled for January 14, 1993. New defense counsel asserted he needed time to assess additional defenses, and/or counterclaims, including those based on possible violations of the Equal Credit Opportunity Act, 15 U.S.C. § 1691–1691f ("the ECOA"). The circuit court granted a continuance until February 23, 1993.

On January 8, 1993, four days after securing this continuance, appellants served the bank with document requests to elicit the facts assertedly necessary to appellants' defense and counterclaim theories. Although this document request required the bank to respond by a date after the discovery deadline, the bank did respond and produced 3500 pages of documents; the bank, however, withheld internal documents relating to the loan and appellants' loan extension application, which appellants asserted they needed to develop their new defenses. On February 16, 1993, appellants filed a supplemental memorandum in opposition to the bank's motion for summary judgment; this was the first filing that set forth the basis of their additional defenses, including a defense based on the ECOA.

On February 22, 1993, appellants moved for (1) another continuance of the summary judgment hearing, scheduled for the next day, February 23, (2) a continuance of the trial, scheduled for April 5, 1993, and (3) production of the bank's internal documents. Appellants also filed a pleading entitled "Amended Answer and Counterclaim." In fact, the answer itself was identical to that filed a year earlier on January 24, 1992; appended to the old answer was a new counterclaim, adding claims predicated on ECOA and fraud. All appellants' motions were opposed by the bank and the bank filed a motion to strike the counterclaim.

The motion to continue the summary judgment hearing was denied and the hearing was held, as scheduled on the next day, February 23, 1993. At that hearing, the circuit court denied the bank's motion to strike appellants' supplemental memorandum in opposition to summary judgment. Instead, the court considered the arguments made in that supplemental memorandum along with all other summary judgment arguments and, ultimately, denied all summary judgment motions.

On March 24, 1993, appellants' motion to continue the trial was denied. A week later, on March 30, 1993, the circuit court granted in part appellants' motion to compel, and directed the bank to produce some of its internal documents. The next

day, March 31, 1993, the court granted the bank's motion to strike appellants' counterclaim. Appellants were granted leave to reassert those claims as affirmative defenses, if approved by the trial judge.

Immediately prior to trial on April 5, 1993, appellant asked the trial judge (a different member of the circuit court) to reconsider the March 31, 1993 order to strike the appellants' counterclaim, or, in the alternative, to grant appellants leave to file a true amended answer, which would have restated their ECOA and fraud counterclaims as affirmative defenses. The trial court denied appellants' motions.

■ Trial commenced that afternoon. After a two and one-half day bench trial, Judge McGuckian found in favor of the bank and entered judgment against each of the appellants for $3,135,412.33 in principal, $519,290.26 in accrued interest through and including April 5, 1993, and late charges in the amount of $156,770.61. On May 13, 1993, the bank filed its application for attorneys' fees, which appellants opposed. On July 9, 1993, after a hearing on the application, the circuit court awarded the bank $97,212.90 in attorneys' fees and $10,133.63 in related litigation expenses. Appellants noted an appeal on July 23, 1993.[1]

Appellants raise seven questions before us:

1. Whether the lower court erred in striking appellants' February 22, 1993 amended answer and counterclaim,

---

1. Although judgment was entered on the awards of principal, interest, and late charges on April 5, 1993, the bank also had a contractual right to attorney's fees, so those fees were part of its damage claim. *See Archway Motors, Inc. v. Herman,* 41 Md.App. 40, 43–44, 394 A.2d 1228 (1978), *cert. denied,* 284 Md. 741 (1979); *Mortgage Investors of Wash. v. Citizens Bank & Trust Co. of Md.,* 29 Md.App. 591, 349 A.2d 647, *aff'd,* 278 Md. 505, 366 A.2d 47 (1976). For this reason, judgment in this case was not final until judgment on the attorney's fees award was entered on July 9, 1993. *Northern Assurance Co. of Am. v. EDP Floors, Inc.,* 311 Md. 217, 222, 533 A.2d 682 (1987). *Compare Maryland–Nat'l Capital Park & Planning Comm'n v. Crawford,* 307 Md. 1, 38–39, 511 A.2d 1079 (1986); *County Executive of Prince George's County v. Doe,* 300 Md. 445, 451 n. 4, 479 A.2d 352 (1984); *Larche v. Car Wholesalers,* 80 Md.App. 322, 326–28, 562 A.2d 1305 (1989). The bank does not claim to the contrary.

the substance of which was communicated to the Bank more than three months before trial?

2. Whether the lower court erred in denying appellants' April 5, 1993 request for leave to file an amended answer?

3. Whether the lower court erred in precluding all testimony concerning the parties post-September 4, 1991 loan extension discussion pursuant to a Pre–Workout Agreement that was not supported by consideration?

4. Whether the lower court erred in admitting Nations-Bank's computer-generated loan reconstruction, particularly without affording appellants an opportunity to review underlying source documents that were responsive to appellants' long-standing discovery requests and present in the courtroom during trial?

5. Whether the lower court erred in failing to find that NationsBank breached its duty to mitigate the damages resulting from the Guarantor Appellants' alleged breach of their Guaranty?

6. Whether the lower court erred in failing to find that the late charge provision contained in the Mattvidi Note was an unenforceable penalty?

7. Whether the lower court erred in awarding Nations-Bank the full amount of requested attorneys' fees and related litigation expenses because the Bank deliberately refused to supplement its responses to appellants' long-standing discovery requests, and did not produce a critical witness at a July 9, 1993 hearing in order to frustrate appellants' ability to test the merits of the Bank's claim for attorneys' fees?

(ii)

The first and second arguments urged by appellants—their principal arguments in this Court—are variations on a common theme, i.e., the circuit court "abused its discretion" in not permitting them to file a counterclaim or an amended answer. Appellants maintain that the lower court erred first on March

31 in striking their counterclaim and second on April 5 in refusing to permit them to file an amended answer. Moreover, in their third argument, appellants assert that the trial court erred in refusing to admit certain evidence designed to prove the merits of the claims that formed the basis of the counterclaim and amended answer. Because these three arguments are so interrelated, we discuss them together.

■ As noted above, appellants concede that the circuit court's decisions on these matters were discretionary. For example, they acknowledge that a circuit court's decision to grant a motion to strike a counterclaim lies within this sound discretion and will be reversed on appeal only if that discretion has been abused. *See Patapsco Assocs. Ltd. Partnership v. Gurany,* 80 Md.App. 200, 204, 560 A.2d 611 (1989). Appellants, however, ignore some of the principles guiding this discretion. They ignore the fact that the rules provide that a party may raise a counterclaim as a matter of right *only* if it is filed within "30 days after the time for filing that party's answer." Md.Rule 2–331(d). They further ignore the mandate in the rules that if a counterclaim is filed more than thirty days after the filing of the answer, as it was here, and another party timely files a motion to strike it, as the bank did here, the motion to strike *"shall"* be granted "unless there is a showing that the *delay does not prejudice* other parties to the action." *Id.* (emphasis added). Accordingly, contrary to the suggestions in appellants' brief, it was not the bank's burden to prove it was prejudiced by appellants' delay in filing the counterclaim, but appellants' burden to show that this delay did not prejudice the bank.

■ Rather than acknowledging the relevant commands of Md.Rule 2–331, appellants focus solely on the rule generally governing amendments, Md.Rule 2–341, which is discussed within. Maryland Rule 2–341 is not applicable in determining if a late counterclaim will be permitted, because there is a specific direction in Md.Rule 2–331 governing late counterclaims. The Minutes of the Rules Committee indicate that it carefully considered this matter and after much debate deter-

mined that rather than putting the burden on the "person wishing to stop the counterclaim from being filed," the "burden" should be "put on the counterclaiming party to show cause" for the late counterclaim. Court of Appeals Standing Committee on Rules of Practice and Procedure, Minutes of Meeting of January 4, 1980 at 7–8. The Committee recognized that this was different than the federal practice or the general policy on amendments. *Id.* at 7–8. The Committee determined that in order to eliminate "unfairness" both to a "party brought in late" by a counterclaim and a party subjected to a "new law suit" by a late counterclaim "the burden" should be put "on the late filing party" to show why counterclaim should be permitted. *Id.* at 7, 9.

The counterclaim here was not filed until February 22, 1993, more than a year after the complaint and answer had been filed, fifteen days after the discovery deadline, and only six weeks prior to trial. The crux of the counterclaim was that in failing to notify appellants within thirty days of their loan application that the application was denied the bank violated the ECOA, committed intentional misrepresentations, and caused appellants "hundreds of thousands of dollars" in damages. Appellants asserted (and continue to assert) that these causes of action "did not present [themselves] until the Bank finally turned down" their "loan request" in early December, 1992, and that they notified the bank in early January, 1993 that they were going to explore the possibility of raising these claims. For these reasons, appellants maintain that they did "everything in their power" to prevent prejudice to the bank and the circuit court's decision to strike the counterclaim because of the "potential for ... prejudice" to the bank was error.

Even if, as appellants argue, the counterclaim did not "present itself" until December 1992, and appellants notified the bank of the potential counterclaim in January, 1993, we still could not conclude that the circuit court abused its discretion in granting the motion to strike the counterclaim. The counterclaim contained numerous factual allegations (38 numbered paragraphs) involving actions taken over 3 years

(1990, 1991, and 1992), three counts (two under the ECOA and one for intentional misrepresentations), asserting wrongdoing by the bank, its predecessor, Sovran Bank N.A., a related company, Armesco, and three different employees of these organizations. The counterclaim contained a request for equitable and monetary relief, including punitive damages, and a demand for a jury trial. In moving to strike the counterclaim, the bank pointed out that its original complaint filed more than a year earlier stated a "straight-forward action ... to collect the amounts due and owing under a defaulted promissory note" and asserted that appellants' counterclaims were "highly fact-intensive ... involving events and circumstances which have never been developed on the record of this case" and so it was "clearly prejudicial" to the bank to require it to litigate the counterclaim, which the appellants had not asserted until six weeks prior to trial when "the discovery period [had] expired."

In response, appellants did *not* demonstrate that the bank would not suffer this prejudice, but rather argued that: (1) the bank would suffer this prejudice in any event because appellants planned to "present the entire factual basis for their ECOA and bad faith defenses/claims" in asserting that the bank failed to mitigate its damages;[2] and (2) appellants' prejudice, if required to forego the counterclaim, would be greater than the bank's if the counterclaim were permitted.

---

**2.** Appellants ultimately did just that. The circuit court after considering the "entire factual basis" presented by appellants for the ECOA and fraud claims totally rejected these claims, finding that the ECOA was "not applicable" and provided neither a defense nor a basis for mitigation. Although appellants assert that the circuit court erred in other portions of its mitigation findings, see *infra* part iv of this opinion, curiously nowhere in their briefs do they challenge the finding that the ECOA was not a proper basis of a mitigation claim. In light of this and our holdings that the lower court did not abuse its discretion in striking appellants' counterclaim and refusing to permit them to file an amended answer, we need not reach the question of the applicability of the ECOA here. We note, however, that both the relevant federal regulation, 12 C.F.R. § 202.2 and a recent decision of a Maryland federal court interpreting it, *Riggs Nat'l Bank v. Webster*, 832 F.Supp. 147, 150 (D.Md.1993), support the conclusions reached by the court below.

After considering memoranda and oral argument on this issue, the circuit court concluded:

> I think filing this counterclaim at this late date [February 22] when we have a trial set for ... April 5th ... just doesn't put the plaintiff [the bank] in a position where the plaintiff can get out of harm's way. I think there is a clear potential for clear prejudice here.

The circuit court did not abuse its discretion in granting the motion to strike appellants' counterclaim. The simple fact is that appellants failed to make a "showing" that their delay in filing the counterclaims would not prejudice the bank.

 We then turn to the question of whether there was any error in the circuit court's refusal to permit the amended answer. Amendments are to "be freely allowed when justice so permits," Md.Rule 2-341(c), and to be denied only if "prejudice to the opposing party or undue delay results." *Robertson v. Davis*, 271 Md. 708, 710, 319 A.2d 816 (1974). Thus, a party opposing an amendment, unlike a party moving to strike a counterclaim, has the burden of demonstrating that the amendment will prejudice it or cause undue delay. The decision as to "whether to permit an amendment," like that as to whether to permit an untimely counterclaim, "rests within the sound discretion of the trial judge, and this discretion is subject to review on appeal only for its abuse." *Id.* While a party can freely amend a pleading at any time prior to 15 days before trial, "[w]ithin 15 days of a scheduled trial date" or thereafter, amendment can be *"only* by written consent of the adverse party or by leave of court." Md.Rule 2-341(b) (emphasis added). Accordingly, a very late amendment—one filed within 15 days of trial—is never a matter of right. When determining if a party opposing an amendment has met its burden of showing prejudice or undue delay, a court can, of course, consider when the amendment is requested. An amending party's failure to act sooner is not, in and of itself, a sufficient reason for refusing to permit an amendment; however, a late amendment may well be more likely to prejudice the other party and cause undue delay.

Here, appellants did not seek to file an amended answer until *the day of trial*.[3] The amended answer was essentially a recasting of the ECOA and fraud counterclaims into affirmative defenses. Thus, in the amended answer, appellants asserted, as they had in the counterclaim, that in failing to notify them within thirty days of their application for a loan extension that the application was denied, the bank violated the ECOA, committed intentional misrepresentations, and caused appellants "hundreds of thousands of dollars" in damages. Like the counterclaim, the amended answer contained numerous factual allegations (35 numbered paragraphs), involving actions taken over three years, asserting wrongdoing by the bank, its predecessor, a related company, and various individual employees of those entities. The bank did not have an opportunity to file a pleading or memorandum opposing or consenting to the amended answer. In argument prior to trial, it is clear, however, that the bank vigorously opposed the amendment. The bank briefly reiterated its arguments made in opposing the counterclaim and then concluded that the affirmative defenses asserted by appellants

appear in this case for the first time this morning. We think that it is a transparent effect, Your Honor, to delay this trial, to delay the day of judgment in this case, in a case which is a straightforward, not fact [int]ensive debt collection case, that is a suit on the note and guarantee. We would ask that their motion be denied.

Immediately thereafter, the court denied the appellants' motion to amend. In light of the well established principle that "an amendment should never be allowed if prejudice to the opposing party or undue delay results," *Robertson*, 271 Md. at 710, 319 A.2d 816, we cannot conclude that, under the facts of this case, the trial court abused its discretion in refusing to permit appellants to file a vastly amended answer

---

**3.** As noted, *supra,* although on February 22, 1993, appellants filed a pleading titled "amended answer and counterclaim," the pleading was actually the previously filed answer with the counterclaim attached to it.

on the day of trial. If the amendment had been permitted, it would have greatly prejudiced the bank unless the bank had been given the opportunity for additional discovery; necessary additional discovery would have delayed the trial, and, of course, resulted in much more complicated litigation.

The result reached here is entirely in accord with the relevant federal case law, for the federal appellate courts have consistently held that the refusal of a trial court to permit amendments asserting new claims, after the close of discovery or on the eve of trial, is not an abuse of discretion. *See, e.g., Deasy v. Hill,* 833 F.2d 38, 40–42 (4th Cir.1987) (motion seeking to assert new claim filed 9 months after action initiated and just before trial was properly denied), *cert. denied,* 485 U.S. 977, 108 S.Ct. 1271, 99 L.Ed.2d 483 (1988); *Colmenares Vivas v. Sun Alliance Ins. Co.,* 807 F.2d 1102, 1108 (1st Cir.1986) (motion to amend seeking to assert new claim filed six days prior to trial properly denied); *Ansam Assocs., Inc. v. Cola Petroleum, Ltd.,* 760 F.2d 442, 446 (2d Cir.1985) (motion to amend seeking to assert new claims filed one year after action initiated and "after the time for discovery had run" properly denied); *Gulf Oil Trading Co. v. M/V Caribe Mar,* 757 F.2d 743, 752 (5th Cir.1985) ("well within" trial court's discretion to reject party's attempt to amend "to interject a completely new theory of recovery into the case three weeks before trial"); *Paschal v. Florida Pub. Employees Relations Comm'n,* 666 F.2d 1381, 1384 (11th Cir.) (motion to amend seeking to assert new claim filed more than year after action initiated and after discovery had ended was properly denied even though there was no evidence of bad faith or dilatory motive by party seeking amendment), *cert. denied,* 457 U.S. 1109, 102 S.Ct. 2911, 73 L.Ed.2d 1319 (1982).

Finally, appellants' claim that the trial court erred in refusing to admit certain evidence designed to prove the merits of their ECOA and fraud claims is meritless. At trial, appellants sought to ask some questions concerning the parties' post-September 1991 loan extension discussions, to prove these

claims.[4] The parties had executed a written Pre–Workout agreement on September 4, 1991, in which appellants agreed that they would "not seek to admit as evidence, or as a basis for any claim against Lender, in any court of law or equity . . . any discussions undertaken . . . pursuant to this letter agreement." The bank objected to appellants' questions on the basis that this evidence was barred by the terms of the Pre–Workout Agreement. Although the circuit court did permit some testimony on post-September discussions, it refused to admit other testimony. Appellants claim that the lower court erred in refusing to permit all of the testimony, because the Pre–Workout Agreement "was not supported by any consideration" and so not "enforceable." Appellants never made this argument below and so it is not properly before us. *See* Md. Rule 8–131(a). Moreover, it seems to us that the bank's agreement to continue to engage in workout discussions for many months after the loan was in default was sufficient consideration for appellants' promise not to use those discussions in future litigation with the bank. In any event, in view of appellants' assertion that "[n]ot withstanding" the trial court's ruling on this evidence, they "still conclusively demonstrated at trial that the Bank violated the ECOA," it is difficult to see what prejudice this ruling caused appellants, even if it had been erroneous.

### (iii)

Appellants maintain that there was an insufficient evidentiary basis for the circuit court's award of principal and interest to the bank. They maintain: (1) the bank's loan reconstruction summary was not a business record; (2) the bank officer, who testified as to this matter, was without personal knowledge of the summary and so could not lay a proper foundation for it; and, (3) the underlying bank records were not made available to appellants.

---

**4.** The evidence was assertedly offered to bolster appellants' argument that the bank had failed to mitigate its damages. *See supra,* note 2.

■ Maryland Courts and Judicial Proceedings Article provides in pertinent part, that:

A writing or record made in the regular course of business as a memorandum or record of an act, transaction, occurrence, or event is admissible to prove the act, transaction, occurrence, or event.

Md.Code (1974, 1989 Repl.Vol.), § 10–101(b) of the Courts & Judicial Proceedings Article. Thus, business records may be introduced, even though hearsay, "when the entry meets the tests of 'necessity and circumstantial guaranty of trustworthiness'." *Smith v. Jones*, 236 Md. 305, 309, 203 A.2d 865 (1964) (quoting *Morrow v. State*, 190 Md. 559, 59 A.2d 325 (1948)). "Summaries or compilations made from such records may be admissible, when a proper foundation has been laid by a qualified witness on the stand." *Id.* at 309–10. "[E]vidence admitted under the business records exception is generally regarded as reliable since any risk of 'insincerity will be minimized, because the business will want accurate records to rely on.'" *Chapman v. State*, 331 Md. 448, 459, 628 A.2d 676 (1993) (quoting Lynn McLain, *Maryland Evidence* § 803(6).1 (1987)). Indeed, the Court of Appeals has recently recognized that bank records have been found to possess the "same degree of accuracy as public records," explaining:

As with public agencies, banks have strong incentives to generate and maintain accurate account records. The nature of their business, as well as state and federal regulation, require that banks meticulously record the transactions that affect their customers' accounts. Such information is the stock and trade of the banking industry.

*Id.* at 464, 628 A.2d 676.

Beverly Gilberg, a Senior Vice President of NationsBank Service Company, who had twenty-four years experience in the banking industry, testified that she was the "manager for the nationwide processing and accounting of all the problem loans that Nations Bank has." Employees working under her supervision maintain an on-line computer system into which entries concerning problem loans are processed on a daily

basis as new information is received; this system contained all information concerning problem loans, including principal balance, interest rates and maturity dates, the processing of payments, advances, and daily accruals. Ms. Gilberg testified that a summary of the history of the Mattvidi loan was created by her office from the business records of the Bank, based on information received from persons having knowledge of the recorded information; that the information contained in the summary was updated at or near the time of the transactions appearing on it; and that the summary was used by the Bank in the ordinary course of its business. Ms. Gilberg further testified that she was in charge of the conversion of the former Sovran Bank computer system to the NationsBank system and that both prior to and after the conversion, the numbers were balanced. She stated that she had checked the information on the summary for accuracy and that three persons in her department had also checked the information. Upon review of the summary, Ms. Gilberg testified that the principal balance due on the loan was $3,135,412.33, and the accrued interest through April 5, 1993 was $519,290.26. After comparing the summary to the official bank records, Ms. Gilberg testified that the figures on the official bank record were the same figures set forth on the summary.

Thus, the bank laid a proper foundation for admission of the summary with Ms. Gilberg's testimony. Her lack of personal knowledge of the records affects "the weight of the evidence but not its admissibility." § 10–101(d) of the Courts & Judicial Proceedings Article. Although the original bank records were not made available to appellants, copies of these records, *i.e.*, microfiche of the loan history, along with a list of the applicable transaction codes, were provided to appellants four months prior to trial. Moreover, the principal balance due and the method of calculation of interest were clearly set forth in the bank's demand letter to appellants years earlier; appellants apparently did not depose any bank official as to this amount. There was no error in admitting the summary or in concluding that the Bank had provided a sufficient

evidentiary basis for its claims of unpaid principal and interest.

(iv)

Appellants next contend that the lower court erred in not finding that the bank failed to mitigate its damages by foreclosing on the property. They claim that if the property had been sold when the note was initially defaulted on or shortly thereafter, the "proceeds would have been sufficient to wipe out" the amount due under the note. Interestingly, they do not assert that they suggested or requested, let alone urged, the bank to foreclose. Appellants do not cite any case from any jurisdiction in which any court has held that a lender in the bank's circumstances must foreclose on a loan in order to mitigate its damages. Rather, in support of their rather extraordinary position,[5] appellants cite only two cases, *Schlossberg v. Epstein,* 73 Md.App. 415, 534 A.2d 1003 (1988), and *Sergeant Co. v. Pickett,* 285 Md. 186, 401 A.2d 651 (1979). Neither aids their cause. These cases simply reiterate the well established principle that "damages are not recoverable if the consequences" of a breach are avoidable. *Sergeant,* 285 Md. at 191, 401 A.2d 651. In other words, a plaintiff "is not entitled to a judgment for damages for a loss that he could have avoided by a reasonable effort." *Sergeant,* 285 Md. at 191–2, 401 A.2d 651 (quoting *M & R Builders v. Michael,* 215 Md. 340, 354–55, 138 A.2d 350 (1958)). This is, of course, true, but it is equally true that a plaintiff has no duty to take any action to mitigate its damages if that action causes the "risk of additional loss or injury." *Id.*

In retrospect, it may be, as appellants now contend, that the wisest course would have been to sell the property in 1991. It may also be, as appellants contend, that bank

---

**5.** More frequently, borrowers claim that a lending institution was at fault for foreclosing too quickly. *See, e.g., Kris Jen Ltd. Partnership v. Fairfax Sav., F.S.B.,* 100 Md.App. 25, 639 A.2d 206 (1994); *Hurlock Food Processors Inv. Assocs. v. Mercantile Safe Deposit & Trust Co.,* 98 Md.App. 314, 633 A.2d 438 (1993), *cert. denied,* 334 Md. 211, 638 A.2d 752 (1994).

officials were aware of the "declining state of the real estate market." Surely, however, the individual appellants, who the circuit court found to be "sophisticated business people, developers who had been in the financial markets for many, many years," were at least equally aware of this "declining state." They could have acted to sell the property themselves. The trial court properly noted that it was appellants' "burden" to demonstrate a failure to mitigate the bank's damages. *Sergeant*, 285 Md. at 203, 401 A.2d 651. Its finding that appellants had not met that burden was not clearly erroneous.

### (v)

■ The Mattvidi note provided in pertinent part:

In the event the Maker fails to fully pay any instalment of principal and/or interest or otherwise fails to repay this Note within ten (10) days of its due date, the Parties agree to pay the Bank on demand a late charge of five percent (5%) of the scheduled payment.

Pursuant to this provision, the circuit court awarded the bank $156,770.61 in late charges. Appellants claim that the provision in the Mattvidi note mandating late charges is "an unenforceable penalty."

■ The note provides that it is to be "governed by and construed in accordance with the laws of the Commonwealth of Virginia." Under Virginia law, "parties to a contract may agree in advance about the amount to be paid as compensation for loss or injury which may result from a breach of the contract '[w]hen the actual damages contemplated at the time of the agreement are uncertain and difficult to determine with exactness and when the amount fixed is not out of all proportion to the probable loss.'" *301 Dahlgren Ltd. Partnership v. Board of Supervisors of King George County*, 240 Va. 200, 396 S.E.2d 651, 653 (1990) (quoting *Taylor v. Sanders*, 233 Va. 73, 353 S.E.2d 745, 746–47 (1987)). "However, when the damages resulting from the breach are susceptible of definite measurement or when the agreed amount would be grossly in excess of actual damages, courts usually construe such an agreement to

be an unenforceable penalty." *Id.* (citing *Taylor,* 353 S.E.2d at 747).

There does not appear to be any Virginia case law determining the legitimacy of a late charge provision like that at issue here. Courts in other jurisdictions, however, have considered such provisions. The modern view seems to be that they are not penalties but reasonable compensation in commercial transactions, "because of the difficulty and impracticality of fixing the amount of actual damages for administrative expenses that will be sustained in the event of late payments." *Travelers Ins. Co. v. Corporex Properties, Inc.,* 798 F.Supp 423, 428 (E.D.Ky.1992). *See, In re LHD Realty Corp. v. National Life Ins. Co.,* 726 F.2d 327, 333 (7th Cir.1984) (citing Indiana Law); *In re Union Square Dev. Co.,* 140 B.R. 544 (Bankr.D.Colo.1992); *O'Connor v. Televideo Sys., Inc.,* 218 Cal.App.3d 709, 267 Cal.Rptr. 237, 242–43 (1990); *Clermont v. Secured Inv. Corp.,* 25 Cal.App.3d 766, 102 Cal.Rptr. 340 (1972); *Chemical Bank v. American Nat'l Bank & Trust Co.,* 180 Ill.App.3d 219, 129 Ill.Dec. 175, 535 N.E.2d 940, 945–47 (1989); *Bowery Sav. Bank v. Layman,* 142 Ind.App. 170, 233 N.E.2d 492 (1968); *Crest Sav. & Loan Assoc. v. Mason,* 243 N.J.Super. 646, 581 A.2d 120 (Ct.Ch.Div.1990). *But see Garrett v. Coast & Southern Fed. Sav. & Loan Ass'n,* 9 Cal.3d 731, 108 Cal.Rptr. 845, 511 P.2d 1197 (1973). *See generally* Gary D. Spivey, Annotation, *Validity & Construction of Provision Imposing "Late Charge" or Similar Exaction by Delay in Making Periodic Payments on Note, Mortgage, or Installment Sale Contract,* 63 A.L.R.3d 50 (1975 & 1993 Cum.Supp.). In view of the abundant out-of-state authority, it seems unlikely that, under Virginia law, the late charge provision would be regarded, as a matter of law, as an unenforceable penalty.

Some courts have nonetheless held that the party seeking to enforce a late charge clause must bear the burden of proving it is not a penalty. *See, e.g., McIlvenny v. Horton,* 227 Ark. 826, 302 S.W.2d 70, 72–73 (1957); *Vines v. Orchard Hills, Inc.,* 181 Conn. 501, 435 A.2d 1022, 1028 (1980); *Pacheco v. Scoblionko,* 532 A.2d 1036, 1038–39 (Me.1987); *Patterson v. Anderson Motor Co., Inc.,* 45 Tenn.App. 35, 319 S.W.2d 492,

501 (1958). The majority rule, however, is that the party seeking to invalidate the clause has the burden of proving it is a penalty. *Paramount Pictures Corp. v. Metro Program Network, Inc.*, 962 F.2d 775 (8th Cir.1992) (applying Iowa law); *First Nat'l Bank of Chicago v. Atlantic Tele–Network Co.*, 946 F.2d 516, 522 (7th Cir.1991) (applying Illinois law); *Pierce Assocs., Inc. v. Nemours Found.*, 865 F.2d 530 (3d Cir.1988), *cert. denied*, 492 U.S. 907, 109 S.Ct. 3218, 106 L.Ed.2d 568 (1989) (applying Delaware law); *Farmers Export Co. v. M/V Georgis Prois*, 799 F.2d 159, 162–63 (5th Cir.1986) (applying Louisiana law); *Rohauer v. Little*, 736 P.2d 403, 410 (Colo.1987); *Oami v. Delk Interchange Ltd*, 193 Ga.App. 640, 388 S.E.2d 706 (1989); *Clampitt v. A.M.R. Corp.*, 109 Idaho 145, 706 P.2d 34, 38 (1985); *Joseph F. Sanson Inv. Co. v. 268 Ltd.*, 106 Nev. 429, 795 P.2d 493 (1990); *Shallow Brook Associs. v. Dube*, 135 N.H. 40, 599 A.2d 132, 138 (1991); *P.J. Carlin Constr. Co. v. City of New York*, 59 A.D.2d 847, 399 N.Y.S.2d 13, 14 (1977); *Illingworth v. Bushong*, 61 Or.App. 152, 656 P.2d 370, 373 (1982), *aff'd*, 297 Or. 675, 688 P.2d 379 (1984); *Baker v. International Record Syndicate*, 812 S.W.2d 53, 55 (Tex.Ct.App.1991); *Young Elec. Sign Co. v. United Standard West, Inc.*, 755 P.2d 162, 164–65 (Utah 1988); *Wassenaar v. Panos*, 111 Wis.2d 518, 331 N.W.2d 357 (1983).

Not only is placing the burden of proof on the party seeking to invalidate a liquidated damages clause the majority rule, it is also the only rule consistent with normal principles of contract law. *See, e.g., Nan Ya Plastics Corp. U.S.A. v. De Santis*, 237 Va. 255, 377 S.E.2d 388, 393, *cert. denied*, 492 U.S. 921, 109 S.Ct. 3248, 106 L.Ed.2d 594 (1989) (burden of proof to establish impossibility of performance of contract is on party who asserts it). Accordingly, we believe it is the rule that would be adopted in Virginia. Moreover, we note that the Virginia statute addressing liquidated damages, unlike that of some states, does not create a presumption that liquidated damages are void.[6] Thus, those seeking to enforce such a

---

**6.** The Virginia Code provides that:

clause under Virginia law do not have the burden of overcoming any such presumption.

When two commercially sophisticated parties freely enter into an agreement containing a late charge clause, like that at issue here, it seems entirely appropriate that the burden of proof should be on the party who later claims that the clause is invalid. Appellants, who the circuit court found to be sophisticated, experienced real estate developers, have never even argued that the late charge provision was obtained by coercion or duress. If appellants truly believed that this provision was not reasonable, they could have negotiated different terms, as they did with regard to other portions of the loan documents. They did not do this. For all of these reasons, we believe the circuit court did not err in awarding the challenged late charges.

(vi)

Appellants' final claim is that the circuit court erred in awarding the bank $97,212.90 in attorneys fees. The Note provided that the bank was entitled to "actual reasonable attorneys' fees" expended in efforts to collect on it. Appellants do not assert to the contrary. Nor do they claim that the fees awarded here were not "actual reasonable attorneys' fees" expended to collect on the note. Rather, their sole claim is that the award of fees was improper because the bank "deliberately refused to supplement its discovery responses and failed to produce a necessary witness" at the hearing on the attorneys fee claim, thereby "frustrat[ing]" appellants' ability to test the merits of the claim for fees. Thus, the nub of this argument is that the bank's claim for fees should be denied because the bank violated the discovery rules.

---

Damages for breach by either party may be liquidated in the agreement but only at an amount which is reasonable in light of the anticipated or actual harm caused by the breach, the difficulties of proof of loss, and the inconvenience or nonfeasibility of otherwise obtaining an adequate remedy. A term fixing unreasonably large liquidated damages is void as a penalty.

Va.Code § 8.2–718 (1965, 1991 Repl.Vol.)

■ It is well established that the trial judge is vested with great discretion in determining the appropriate remedy for failure to comply with the discovery rules. *See e.g. Klein v. Weiss,* 284 Md. 36, 56, 395 A.2d 126 (1978); *Mason v. Wolfing,* 265 Md. 234, 236, 288 A.2d 880 (1972). Accordingly, even if the bank had "deliberately" refused to obey the discovery rules, the circuit court's award of fees might still be a proper exercise of its discretion. Under the actual facts of this case, that conclusion is inevitable. Contrary to appellants' arguments, there is little support in this record for the claim that the bank "deliberately ... withheld" critical information from appellants, which, in turn "frustrate[d]" appellants' ability to defend against the attorneys fees award.

Appellants' assertion to the contrary is built on reference to carefully selected portions of the record, and omissions of other highly relevant facts. For example, while it is true that the bank did not respond to appellants' January 23, 1992 document request or interrogatory requesting description of all actual damages, including attorneys fees, until December, 1992, it is equally true that the parties *mutually agreed* on a number of occasions during 1992, in order to facilitate workout discussions, to extend the time within which the bank's responses would be due. When the bank determined no workout was possible, it did promptly respond to these discovery requests; in its response, it indicated that through April 30, 1992, its attorneys fees were $13,939.91. Similarly, while it is true that the bank did not supplement this answer at the February, 1993 summary judgment hearing, in fact, the record indicates that at that time the bank had only received bills for attorneys fees totalling $13,939.91. Additional bills were not received until March 22, 1993 and June 2, 1993.

■ All parties, of course, have an obligation to "supplement" discovery responses "promptly" with information received prior to trial. Md.Rule 2–401(d). Thus, the bank should have filed supplemental answers with the information contained in the March 22 billing prior to the April 5 trial. (Obviously, it could not supplement its answers prior to the

April 5 trial with the information contained in the June 2 billing.) There is, however, no basis for holding that the circuit court erred in concluding that this failure to supplement was not a "willful refusal to" supplement prohibiting the amended information from being admitted at trial. *See Hadid v. Alexander*, 55 Md.App. 344, 351, 462 A.2d 1216 (1983). The March 22 billing was not received until less than two weeks prior to trial when the bank was in the midst of trial preparations—the docket entries during that period indicate not only the usual pre-trial flurry but that on three separate days the parties were engaged in court appearances in this case. The bank's failure to supplement interrogatory response in this period of frantic pretrial activity is understandable. Moreover, it is difficult to see how this failure prejudiced appellants; they must have recognized (*inter alia,* from the size of their own legal bills) that the bank was incurring more and greater legal fees as the litigation "heated up." On May 13, 1993, promptly after the circuit court entered its "judgment order" for the bank, awarding it, *inter alia,* "reasonable attorney's fees as approved by the Court," the bank filed an application for fees, setting forth its request for fees in excess of $90,000 and expenses in excess of $10,000. When appellants complained about this application, the bank amended it and appended to the amended filing the detailed bills supporting the request; the amended filing and supporting documents were filed a week prior to the hearing on the attorneys' fees request. Appellants did not move for additional time or information in order to prepare their opposition to the request.

Although the appellants now claim that the bank did not "produce a necessary witness" (the associate who completed initial detailed review of the bills) at that hearing, they never subpoenaed that witness or even took her deposition. Indeed, appellants never objected at the hearing to the bank's failure to call this witness. The bank did support its fee application with the testimony at the hearing of its lead counsel, William R. Naeher, who appellants conceded was an "expert" on attorneys' fees. Mr. Naeher testified in detail as to the legal

services rendered to the bank and bills for those services, including the scope of representation, his review of the attorneys' fees application line by line, his belief that it reflected an accurate statement of the attorneys fees incurred by the bank and his conclusion that the fees charged were reasonable. In the face of this evidence and the fact that the circuit court had presided at trial and well knew the intricacies involved in this litigation, the court did not abuse its discretion in awarding the requested fees, finding that they were "in line with the amount of effort and time and complexity of this particular case."

JUDGMENT AFFIRMED.

COSTS TO BE PAID BY APPELLANTS.