17 A.3d 781

**John C. DAVIES**

v.

**STATE of Maryland.**

**No. 1818, Sept. Term, 2010.**

Court of Special Appeals of Maryland.

April 5, 2011.

Tobin J. Romero (Williams & Connolly LLP, on the brief), Washington, DC, for Appellant.

Mary Ann Ince (Douglas F. Gansler, Atty. Gen., on the brief), Baltimore, MD, for Appellee.

Panel: DEBORAH S. EYLER, MEREDITH, and
CHARLES E. MOYLAN, JR., (Retired, Specially Assigned),
JJ.

MEREDITH, J.

After a jury trial in the Circuit Court for Montgomery
County, John C. Davies, appellant, was convicted of felony
theft, embezzlement, and unauthorized use of a credit card.
The circuit court sentenced Davies to five years' imprison-
ment, with all but eighteen months suspended. Davies noted
a timely appeal.

On appeal, Davies presented six questions for review, in-
cluding the following three, which we have renumbered:

[1] Did admission of an out-of-court written statement that
certain credit-card charges were "unauthorized" (which un-
identified declarants prepared at the request of the State
for use in the prosecution) violate the hearsay rule and the
Confrontation Clause?

[2] Did the court erroneously quash a defense subpoena
for evidence of bias and motive regarding the State's key
witnesses on the grounds that the State, which did not
obtain this evidence, allegedly provided in discovery the
evidence that it had obtained?

[3] Did the court erroneously exclude evidence and pre-
vent cross-examination regarding the bias and motive of the
State's key witnesses to discredit Mr. Davies and to falsely
accuse him of unauthorized credit card use [where the
evidence would show that] he had previously accused them
of financial irregularities and mismanagement?

We answer the first question in the affirmative, and we will
reverse the circuit court's judgment. Because the second
question is likely to arise again in the event of a new trial, we
will address it, and answer in the affirmative. The third
question has not been adequately preserved for our review,
but can be pursued by Davies at the time of new trial.[1]

---

1. In addition to these three questions Davies raised the following
questions, which we decline to address:

## Facts and Procedural History

Immanuel Church has approximately 4000 members and eight pastors. Located in Montgomery County, Maryland, it has annual revenues of approximately $8 million. In March 2007, the Church hired John Davies to manage its finance department. The Church's finance department has several employees who "handle receivables, payables, payroll, [and] various other duties."

The finance department administered the Church's credit card accounts, including one with Capital One VISA. If Church employees wanted to make a purchase using the Capital One card, they were supposed to submit request forms (sometimes referred to as "authorized user documents") for the finance department's approval, and then sign out the credit card. After making a purchase, the employees were expected to return the card to the finance department with the receipt for the purchase. A finance department staff member was then supposed to enter the authorization information into the Church's computer accounting system.

In July 2008, Davies resigned from his position as finance manager. Pastor Guy Carey—who oversaw the finance department and was a member of the Church's executive team—assumed the duties of the finance manager, and began reviewing the credit card statements for the Capital One account. Upon reviewing these statements, Pastor Carey noticed charges which he questioned. According to Pastor Carey, he also became aware for the first time that Davies had been

[a] Did the prosecutor's expression of his personal opinion concerning Mr. Davies's truthfulness violate the settled rule precluding such expressions of personal belief?

[b] Did the court erroneously refuse to grant a new trial or a hearing based on newly-discovered evidence that Mr. Davies's former employer destroyed financial records taken from his office after he departed, where the State's evidence that the credit-card charges were unauthorized was based on the former employer's supposed inability to locate authorization records?

[c] Should the restitution order directing Mr. Davies to pay $17,795 be vacated when the State offered no evidence at sentencing that Mr. Davies caused his former employer to suffer a loss of that amount?

added to the list of persons authorized by Capital One to use the Church's credit card.

The Church reported to the Montgomery County Police Department that Davies had made unauthorized credit card purchases. The police requested that the Church prepare a spreadsheet summarizing which of the charges on the Capital One account were unauthorized. In response, the Church gave the police a spreadsheet "prepared by the finance department and others," which was comprised of six columns labeled: "Date," "Vendor," "Description," "Charge amount," "Payments," and "Employee Dishonesty."

Pastor Carey said that the Church took the following steps to compile the spreadsheet. The Church obtained credit card statements from Capital One for the period of February 2008 to September 2008. The chart's "Date," "Vendor," "Charge amount," and "Payments" columns were copied directly from the Capital One statements. Church staff reviewed each of the charges listed on the statements to determine which of the charges were not supported by proper documentation in the Church's records of approved credit card purchases. In order to do so, Church staff reviewed various finance department records to determine whether the required authorized user documents existed for each of the purchases. If the forms could not be found, Church staff listed the dollar amount of the purchase in the "Employee Dishonesty" column. Church staff also attempted to learn the purpose for each of the charges by calling the vendor at which the credit card was used and/or by referring to the Church's own records. If Church staff could find information regarding the purpose for the charge, that information was listed in the "Description" column. For instance, one entry in the Description column indicated that, on March 24, 2008, there was a charge of $227.00 for "3rd Party Collection J. Dav," and the corresponding amount $227.00 appears in the column under Employee Dishonesty.

Based on the information provided to them by the Church, the police obtained and executed a search warrant at Davies's

home. Police recovered evidence of items that had been purchased or paid for with the Church's Capital One VISA. The evidence that was seized included life insurance documents, car insurance documents, a bill from a plumber who had performed work on Davies's home, and bottles of mail-order acne medication.

Prior to trial, Davies served the Church with a subpoena to produce, among other information, the "[f]orms or other documents reflecting requests for permission to use, or approval of the use of, the Church Credit Cards." Davies also served a subpoena upon the Church's outside accountant commanding the accountant to produce, among other documents, the Church's 2006 and 2007 financial statements, its correspondence with Davies, and reports made to the accountant by Davies during his tenure. The State successfully moved to quash the subpoenas.

The State used the Church's spreadsheet described above to create two charts that were offered as exhibits at trial. The first chart, which was admitted into evidence over Davies's objection as State's Exhibit 3, is a 6-page document that contains the same information as the spreadsheet, but the label of the "Employee Dishonesty" column had been changed to "Unauthorized Charges." The second chart, which was admitted into evidence over Davies's objection as State's Exhibit 4, is a one-page summary, derived from State's Exhibit 3, listing the subtotal of unauthorized charges for each statement period.

Davies moved in limine to exclude State's Exhibits 3 and 4. The circuit court reserved ruling on the motion. At trial, the State elicited testimony from Pastor Carey to lay a foundation for the introduction of the charts. Pastor Carey explained that unidentified persons at the Church gathered the information shown in the "Description" and "Unauthorized Charges" columns in State's Exhibit 3. During this direct examination, the testimony was as follows:

[The State]: Okay. Now, this column here, "description," what is in that column?

[Pastor Carey]: Description was entered by staff is, if they were able to determine something in either a phone call to a vendor or from direct records.

[Defense Counsel]: Objection. Move to strike.

THE COURT: I'll sustain the objection.

[The State]: Okay.

BY [The State]:

Q. The information in the "description" column that is—phrase it this way. Where the church was able to confirm what the purposes of charges that were on the initial credit card statement, were you able to find out, this is a legitimate charge, basically. Did the church then make a notation in this "description" column as to why that was a legitimate charge about, that appeared on the credit card statement?

[Defense Counsel]: Objection.

[Pastor Carey]: There were two functions.

THE COURT: Overruled....

[Pastor Carey]: There were two functions actually occurring in the description, and with the reconciliation. In that none of these items had been posted properly to the financial records of the church, there was also an attempt to distinguish what expenses, if they were approved, they related to; and if they were unapproved, what they might have been.

\*    \*    \*

[The State]: **Okay. All right. Then the last column here of "unauthorized charges," how was it decided if an entry was made in that unauthorized column?**

[Pastor Carey]: **All of the records that we have that would indicate approval to purchase with credit card would require approved purchase request, and approved credit card use request. Those records were consulted to determine whether or not the paperwork existed for approval. If the paperwork existed for approval, it was**

searched.  If an item was not there, then the vendor was contacted.

[The State]: Okay. All right.  And—

[Defense Counsel:]  Objection.  Move to strike.

THE COURT: Overruled.

BY [The State]:

Q.  **And where you were not able to find any records supporting the payment, it was then put, listed in the unauthorized charge [column], is that correct?**

[Defense Counsel]: Objection.

THE COURT: Overruled.

[Pastor Carey]: **That's correct.**

(Emphasis added.)

Over Davies's repeated objection, the circuit court admitted State's Exhibits 3 and 4.  In addition, the court admitted, without objection by Davies, the monthly credit card statements which the Church had used to complete portions of the charts.  No authorization forms were introduced by the State.  Nor did the staff members who were said to have conducted the searches for authorization forms testify regarding their inability to locate authorization forms.

Two Church pastors testified at trial that Capital One had told them that its records reflected there were three approved users of the credit card:  Davies, and two other Church employees—Pastor Charles Schmitt and Terry Golden.  Pastor Carey testified that, during the investigation of credit card charges, the Church distinguished Davies's usage of the card from the other two approved users by a review of "signatures and merchant receipts and/or from the authorized user documents that [the Church retains] when it authorizes a purchase."  No such documents were offered in evidence, however.  Pastor Carey said that these documents "weren't requested" by the police when the Church submitted its report.  Davies was never given the opportunity to review the referenced documents.

Davies sought to introduce into evidence as Defense Exhibit 7 a report he had authored as the finance manager shortly before his termination. In the report, Davies made numerous criticisms of the management of the Church's finances by its leadership, including Pastor Carey. Davies alleged in his report that the Church administration had improperly concealed a $340,828 discrepancy in its 2006 financial statements. The circuit court excluded this evidence, and sustained objections to Davies's attempt to elicit testimony concerning allegations of the Church's financial mismanagement.

## Discussion

### Summary Exhibits

The decision to admit evidence is ordinarily left to the circuit court's sound discretion. *Bern–Shaw Limited Partnership v. Baltimore*, 377 Md. 277, 291, 833 A.2d 502 (2003). Nevertheless, if the circuit court's "ruling involves a pure legal question, we generally review the [ ] court's ruling *de novo*." *Id. Accord Hall v. UMMS*, 398 Md. 67, 82–83, 919 A.2d 1177 (2007); *J.L. Matthews, Inc. v. Park & Planning*, 368 Md. 71, 92–93, 792 A.2d 288 (2002). Statutory interpretation and the admission of hearsay are legal questions subject to *de novo* review. As the Court of Appeals explained in *Bernadyn v. State*, 390 Md. 1, 7–8, 887 A.2d 602 (2005) (citation omitted):

> We review rulings on the admissibility of evidence ordinarily on an abuse of discretion standard. Review of the admissibility of evidence which is hearsay is different. Hearsay, under our rules, *must* be excluded as evidence at trial, unless it falls within an exception to the hearsay rule excluding such evidence or is "permitted by applicable constitutional provisions or statutes." Md. Rule 5–802. Thus, a circuit court has no discretion to admit hearsay in the absence of a provision providing for its admissibility. Whether evidence is hearsay is an issue of law reviewed *de novo*.

■■■ Similarly, in a criminal trial, the court has no discretion to admit "testimonial evidence" that would violate the defendant's Sixth Amendment rights under the Confrontation Clause. *Crawford v. Washington*, 541 U.S. 36, 68, 124 S.Ct. 1354, 1374, 158 L.Ed.2d 177 (2004) ("Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). As we noted in *Snowden v. State*, 156 Md.App. 139, 143 n. 4, 846 A.2d 36 (2004), *aff'd*, 385 Md. 64, 867 A.2d 314 (2005): "We ... apply the *de novo* standard of review to the issue of whether the Confrontation Clause was violated. . . ."

■■■ In the present case, the circuit court admitted State's Exhibits 3 and 4 pursuant to Maryland Rule 5–1006, which permits, upon certain conditions, a summary of the contents of voluminous documents to be admitted into evidence in lieu of the voluminous documents. Pertinent to this case, the documents which are summarized must themselves be "otherwise admissible." Here, because of (1) the investigators' commentary added to State's Exhibit 3 under Description, and (2) the exhibit's representation of the investigators' conclusions as to which charges were "unauthorized," State's Exhibit 3 did not satisfy the requirement of Rule 5–1006 that it summarize only "writings, recordings, or photographs, otherwise admissible." State's Exhibit 4 was a summary derived from State's Exhibit 3, and was, therefore, not admissible because State's Exhibit 3 was not admissible.

Rule 5–1006 states:

The contents of voluminous writings, recordings, or photographs, otherwise admissible, which cannot conveniently be examined in court may be presented in the form of a chart, calculation, or other summary. The party intending to use such a summary must give timely notice to all parties of the intention to use the summary and shall make the summary and the originals or duplicates from which the summary is compiled available for inspection and copying by other

parties · at a reasonable time and place. The court may order that they be produced in court.

Rule 5–1006 is derived from Federal Rule of Evidence ("FRE") 1006.[2] Like FRE 1006, Maryland Rule 5–1006 does not require that the summarized writings, recordings, or photographs themselves be introduced into evidence even though the underlying documents must nevertheless be "otherwise admissible." *Milton Co. v. Bentley Place,* 121 Md.App. 100, 121, 708 A.2d 1047 (1998) (for purposes of admitting a summary under Rule 5–1006, "the original ... records were not required"), *aff'd on other grounds,* 354 Md. 264, 729 A.2d 981 (1999). *See United States v. Bakker,* 925 F.2d 728, 736 (4th Cir.1991) (FRE 1006 "does not require that the original voluminous material be introduced into evidence"). Further, under either rule, the party seeking to introduce the summary is required to make the underlying documents available for inspection and copying by the other party at a "reasonable time and place." *Mattvidi v. NationsBank,* 100 Md.App. 71, 88–89, 639 A.2d 228 (1994) (summary properly admitted into evidence where underlying records were "provided to appellants four months prior to trial"). In contrast to FRE 1006, Maryland Rule 5–1006 includes a requirement that the summary itself also be made available for "inspection and copying."

Professor McLain describes the notice requirements of Rule 5–1006 as follows in 6A LYNN McLAIN, MARYLAND EVIDENCE § 1006:1(a) (2d ed. 2001):

> The proponent must give notice of his or her intent to use summary evidence, so as to allow the opponent to be prepared to evaluate its accuracy. **The opposing party must be afforded an adequate opportunity to inspect the**

---

**2.** Federal Rule of Evidence 1006 states:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

**underlying writings at "a reasonable time and place."**
The judge may require their production in court (a result
that should be avoided if production in court is too impracti-
cal).

(Footnotes omitted; emphasis added.)

Davies objected at trial that (a) part of the information
which had been summarized in State's Exhibit 3 was inadmis-
sible hearsay; and (b) even if the exhibits had been properly
limited to summarizing writings that were otherwise admissi-
ble, the State failed to make the underlying documents "avail-
able for inspection and copying" as required by Rule 5–1006.

Davies's first contention challenges whether the information
in the summary chart meets the requirement of Rule 5–1006
that the summary be comprised exclusively of information
contained in documents which are "otherwise admissible." As
noted above, State's Exhibit 3 is comprised of four compo-
nents: (1) information copied from the Capital One state-
ments; (2) information and mental impressions obtained from
Church staff members who reviewed the Church's authorized
user documents and receipts to determine whether the
charges were unauthorized; (3) information and mental im-
pressions obtained from Church staff members who made
phone calls to vendors listed on the statements and reviewed
records in order to complete the "Description" column; and
(4) a conclusion made by some unspecified person or persons
as to whether each charge was or was not unauthorized. The
first component was admitted into evidence. But the remain-
ing components were not, either by way of supporting docu-
ments or testimony. And, even if the investigations had been
documented in some manner—as to which there was no evi-
dence—it is likely that such documents would have been
hearsay or double hearsay, and not "otherwise admissible."

The Capital One statements were subpoenaed by Davies
himself, and were authenticated and admitted into evidence as
business records. But the 130 or so authorized user docu-
ments that were apparently found to exist among the financial
records of the Church were not offered into evidence or

produced in court, or otherwise made available to Davies for inspection and copying. With proper foundation testimony, they may have been admissible as business records pursuant to Rule 5–803(b)(6).

Further, Rule 5–803(b)(7) provides that the *absence* of a business record may be used to prove "the nonoccurrence or nonexistence of the matter, if the matter was a kind about which a memorandum, report, record, or data compilation was regularly made and preserved." *See* McLAIN, *supra*, at § 1006:1(c). Accordingly, it might have been possible for appropriate persons with personal knowledge to have testified that, in the language of Rule 5–803(b)(7), "a diligent search [had] disclosed that [an authorization form for a questioned charge or charges] is not included in the" business records of the Church that had been kept in accordance with Rule 5–803(b)(6). But there was no such testimony offered in this case.

In addition to failing to satisfy the "otherwise admissible" prerequisite of Rule 5–1006, the State never made the underlying documents which were purportedly summarized in the charts available to Davies "for inspection and copying," as is expressly required by the rule. At trial, the State explained that, "as soon as we received any document" from the Church, the document was turned over to Davies as part of the prosecutor's open file discovery policy. The State, however, apparently neither requested nor received from the Church the authorized user documents, receipts, or other pertinent documents that the Church had used to create the spreadsheet. Davies attempted to subpoena these documents himself. On the State's motion, however, the circuit court quashed Davies's subpoena in which he requested these documents, despite the mandate of Rule 5–1006 that the party seeking to introduce a summary "shall make the summary and the originals or duplicates from which the summary is compiled available for inspection and copying by other parties at a reasonable time and place." *Cf. Hutchinson v. State*, 36 Md.App. 58, 62–63, 373 A.2d 50 (1977) (recognizing that, in a case where the circuit court allowed testimony summarizing

the contents of a defendant-prisoner's administrative file, which was not in evidence, the defendant "or his counsel had the right, of course, to examine the file").

Davies's complaint about being denied the opportunity to inspect the underlying documentation is not a mere technicality. A genuine concern about the reliability of the Church's credit card records was raised during the testimony of one Church employee who was called as a witness by the State. After testifying that she was in charge of accounts payable at the Church, the witness described the procedures that are theoretically supposed to be followed by persons who use the Church's credit cards. But she then acknowledged that the procedures were not always followed and that the Church's credit card records were "incomplete" and "inaccurate." The following testimony was elicited during the State's case:

Q [By the State] Okay. And again, were any of those cards, was anyone authorized to make personal purchases on those cards?

A [By the Church employee responsible for accounts payable] No. But we did have a, some purchases that people made without my okay, or my boss okay.

Q Okay. And when you were attempting to reconcile the account, you would then note whether or not it was an authorized charge, correct?

A Yes. I would send out e-mails because just, even before John [Davies] came, there was a problem with the credit cards. A lot of people knew the numbers, and they would even make purchases—

Q I'm going to—

A —without getting the card—

Q Okay.

A —from me.

\* \* \*

Q [By Defense Counsel] Ma'am, I think you testified that there were problems with, at the church with people

using the credit card without authorization, and not sending you the right form, is that correct?

A Yes.

Q Okay. And that happened before John Davies was at the church?

A Yes.

* * *

Q Okay. I think you testified about some of the procedures that you did to do the reconciliations for the credit cards, and the authorizations. You remember that testimony on direct?

A Yes.

Q And sometimes, ma'am, people weren't very good about sending in their paperwork, were they?

A No, they were not.

Q Okay. Sometimes you'd send an e-mail and you'd ask for the paperwork. And sometimes you'd get it, and sometimes you wouldn't?

A Yes, that's correct.

Q All right. And sometimes you'd chase people. And no matter how many—

A I would send out—

Q —e-mails you sent, you never got the documents, right, ma'am?

A That's true.

Q That's true. And so the church records relating to who was authorized to use the cards, those are incomplete, aren't they, ma'am?

A Yes, they were.

* * *

Q I think you also testified there was a sign-out sheet for the credit card?

A Yes.

Q Did people always use the sign-out sheets?

A No, they did not.

Q   Okay. Did you try to remind them to use the sign-out sheets?

A   I did.

Q   Did John Davies—

A   And my boss.

Q   —try to remind people to use the sign-out sheets?

A   Yes.

\*       \*       \*

Q   Okay. And I think you testified something a little bit about—make sure I'm right—entering some data into something called Shelby, is that right?

A   Our, yes, our accounting system is called Shelby.

Q   Shelby.

\*       \*       \*

Q   Did the church have some problems with sometimes the date [sic] in Shelby not being accurate?

A   Yes. We did have some problems with Shelby.

\*       \*       \*

Q   Ma'am, I think you also testified that there were approval forms that were supposed to be filled out?

A   Yes.

Q   Okay. And did people always fill those out?   Did you have problems getting those as well?

A   No, they did not.

Q   No, they did not always fill them out?

A   They did not always fill them out.

Q   Okay. So the church's records relating to approval forms were also incomplete?

A   Yes.

Q   And inaccurate?

A   Yes.

\*       \*       \*

Q   Okay. Did you have problems with the filing of the credit card records?

A   Yes, we did.

Q   Yes. Sometimes the records were hard to find?

A   Sometime we did not get the—

Q   Right.

A   —correct paperwork to file.

The circuit court's error in admitting State's Exhibits 3 and 4 was not harmless. In *Dorsey v. State*, 276 Md. 638, 659, 350 A.2d 665 (1976), the Court explained the standard for determining whether an error was harmless in a criminal case:

> We conclude that when an appellant, in a criminal case, establishes error, unless a reviewing court, upon its own independent review of the record, is able to declare a belief, beyond a reasonable doubt, that the error in no way influenced the verdict, such error cannot be deemed "harmless" and a reversal is mandated. Such reviewing court must thus be satisfied that there is no reasonable possibility that the evidence complained of—whether erroneously admitted or excluded—may have contributed to the rendition of the guilty verdict.

(Footnote omitted.)

Here, State's Exhibits 3 and 4 were the only source of information presented to the jury that purported to set forth which charges were unauthorized. We are not persuaded beyond a reasonable doubt that the exhibits did not influence the jury's verdict. Consequently, we reverse the judgments entered by the circuit court, and remand the case for further proceedings.

Because the following issues are likely to arise in the event of a retrial, we will address them here.

**Document Subpoena**

Davies contends that the circuit court erred in quashing his subpoena of the records of the Church's accounting firm ("the Reumont firm"). Davies argues that the court should not have quashed his subpoena for the production of the following documents:

- Documents relating to work the Reumont firm performed in connection with any audit or investigation of alleged thefts by John Davies and/or Collin Booth;
- Copies of [the Church's] financial statements for 2006 and 2007—the years that Mr. Davies worked on the preparation of the financial statements;
- Reports prepared by the firm for [the Church] during Mr. Davies'[s] tenure; and
- Correspondence (including reports or memoranda) the Reumont firm sent to or received from John Davies.

The State moved to quash the subpoena on grounds that it would result in "undue burden or expense" under Rule 4–266(c). Davies filed an opposition in which he argued that the requested documents were "relevant to the bias and motivations of [the Church's] witnesses." Prior to trial, the circuit court, relying upon the State's assurance that it had already submitted to Davies all the documents it had available to it, quashed the subpoena. The court stated:

All right, well, the representation is that the documents that [the State has] available to [it] have been submitted in discovery, so at this juncture, we're ready for trial. I'll grant the motion [to quash].

The right to compulsory process under the Sixth Amendment to the U.S. Constitution and Article 21 of the Maryland Declaration of Rights includes the right to subpoena admissible evidence. *Wilson v. State*, 345 Md. 437, 450, 693 A.2d 344 (1997). "All facts tending to prove bias, prejudice, improper motivation, or interest are proper subjects for impeachment of a witness." McLAIN, *supra*, at § 607:2(a). In *Marlin v. State*, 364 Md. 692, 698, 775 A.2d 385 (2001), the Court of Appeals explained that a criminal defendant's right to impeach a witness concerning possible interest, bias, or motive to lie has its roots in both the federal constitution, and Maryland Declaration of Rights. Davies's ability to impeach the witnesses against him by offering evidence to show that he had criticized the witnesses was unduly limited by the court's quashing of the subpoena. The circuit court abused its discre-

tion in denying Davies access to these documents which relate to the Church's potential motive to make criminal accusations against him.

## Cross-examination

■ Davies also contends that the circuit court erred in limiting his cross examination of the Church's witnesses relative to their potential motives for making accusations against him. Davies attempted to elicit testimony regarding discrepancies in the Church's bookkeeping, and sought to introduce as Defense Exhibit 7 a report he authored as finance manager in which he criticized the Church's financial management. On appeal, Davies argues that this evidence was admissible to impeach the Church's witnesses by demonstrating their bias or motive to fabricate the criminal charges against him. When we review the trial transcript, however, it is not clear to us that Davies made clear to the trial court the argument made on appeal. Consequently, we decline to address this issue further. *See* Rule 8–131(a). Upon retrial, Davies will have another opportunity to offer evidence that might show that the witnesses against him had a motive to make false accusations.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY MONTGOMERY COUNTY.**