*Angelo Reno Harrod v. State of Maryland*, Nos. 7 & 8, September Term, 2023. Opinion by Tang, J.

**CRIMINAL LAW – EVIDENCE – FACTS IN ISSUE AND RELEVANCE – SUBSEQUENT CONDITION OR CONDUCT OF ACCUSED – IN GENERAL**

Evidence of defendant's attempted flight and analogous conduct during apprehension was relevant as evidence of consciousness of guilt; it tended to show that he wanted to evade capture and prevent evidence linking him to the shooting from being recovered.

**CRIMINAL LAW – EVIDENCE – FACTS IN ISSUE AND RELEVANCE – SUBSEQUENT CONDITION OR CONDUCT OF ACCUSED – FLIGHT OR REFUSAL TO FLEE**

Evidence that defendant accused of shooting attempted to flee when police apprehended him within 24 hours was admissible despite that, at the time of apprehension, defendant had active warrants for unrelated offenses and possessed drug-related paraphernalia.

**CRIMINAL LAW – EVIDENCE – OTHER MISCONDUCT BY ACCUSED – NATURE AND CIRCUMSTANCES OF OTHER MISCONDUCT AFFECTING ADMISSIBILITY**

Evidence that tends to show consciousness of guilt is relevant and is not rendered inadmissible simply because it may indicate that defendant committed another offense.

**CRIMINAL LAW – TRIAL – PROVINCE OF COURT AND JURY IN GENERAL – QUESTIONS OF LAW OR OF FACT – WEIGHT AND SUFFICIENCY IN GENERAL – CIRCUMSTANCIAL EVIDENCE**

Whether attempted flight and analogous conduct show consciousness of guilt for the offense on trial when, at the time of apprehension, defendant had active warrants for unrelated offenses and possessed drug-related paraphernalia went to weight of evidence.

**CRIMINAL LAW – EVIDENCE – BEST AND SECONDARY EVIDENCE – NECESSITY AND ADMISSIBILITY OF BEST EVIDENCE IN CRIMINAL PROSECUTIONS – ADMISSIBILITY OF SECONDARY EVIDENCE**

Composite video showing suspect in various clips selected from original surveillance footage by State was admissible because voluminous source videos could not be conveniently examined in court. Possibility that composite video supported State's theory of the case went to weight of evidence, not admissibility. Md. Rule 5-1006.

**CRIMINAL LAW – TRIAL – RECEPTION OF EVIDENCE – INTRODUCTION OF DOCUMENTARY AND DEMONSTRATIVE EVIDENCE**

Trial court did not abuse its discretion in allowing detectives to explain what various clips portrayed. Their knowledge of the area and camera locations provided a foundation for them to describe what they saw on the videos in a way that helped the jury understand the chronology of events and how it related to other evidence presented at trial. Md. Rule 5-701.

Circuit Court for Anne Arundel County
Case No. C-02-CR-21-002137
Case No. C-02-CR-21-001473

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

Nos. 7 & 8
September Term, 2023

_____

ANGELO RENO HARROD

v.

STATE OF MARYLAND

_____

Reed,
Tang,
Eyler, James R.,
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Tang, J.

_____

Filed: April 22, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

Just after midnight on June 29, 2021, two gunmen opened fire on an occupied vehicle in a residential parking lot next to the Graduate Hotel in Annapolis, Maryland. The occupants were unharmed, but a bullet struck and fatally wounded Michelle Cummings, who happened to be on the hotel patio.

According to the State, the intended targets of the shooting—Breonna Barnes and Roderick Atwell—were driving around the neighborhood near the hotel while the gunmen followed them on foot. The State's theory was based on the movements of one individual—later identified as Angelo Reno Harrod, the appellant—who was captured on multiple surveillance cameras wearing distinctive black clothing. The appellant was arrested within 24 hours of the shooting.

After a trial in the Circuit Court for Anne Arundel County, a jury convicted the appellant of first-degree murder of Mrs. Cummings, among other offenses. On appeal, the appellant presents three questions for our review:[1]

  I. Did the trial court err in admitting evidence of the appellant's reaction to his arrest as "consciousness of guilt" evidence?

  II. Did the trial court err in admitting a composite video prepared from source surveillance videos as summary evidence?

  III. Did the trial court err in permitting detectives to narrate portions of video evidence?

For the reasons below, we shall affirm the judgments of the circuit court.

---

[1] The appellant was charged in two separate cases in the Circuit Court (Case Nos. C-02-CR-21-001473 and C-02-CR-21-002137), consolidated for trial. The appellant filed a notice of appeal in each case. The two appeals were docketed as No. 7 (C-02-CR-21-002137) and No. 8 (C-02-CR-21-001473) and later consolidated in this Court.

# BACKGROUND

In the hour leading up to the shooting, Ms. Barnes, who was the driver of a Chevrolet Trailblazer, picked up Mr. Atwell and her nephew. After dropping off her nephew in the neighborhood near the hotel, the couple drove to a fast-food restaurant before returning to the neighborhood to drop Mr. Atwell off at his house on Pleasant Street.

At about 12:17 a.m., Ms. Barnes and Mr. Atwell parked in a residential parking lot at the end of Pleasant Street. The vehicle faced the patio of the Graduate Hotel. An iron fence, a five-foot-high concrete wall, and a waist-high brick wall separated the hotel patio from the residential parking lot.

Ms. Barnes's cell phone rang, and she exited the car to answer the call. As she did so, she heard someone call out her name. She turned and saw two men standing beside a dumpster, wearing "all black, black pants, black sweatshirt, [and] hood." Ms. Barnes got back into her car. Then, she heard one man say, "[Y]ou have five seconds." He began counting down, and Ms. Barnes saw him reach into the front of his pants and pull something out. Then, she heard gunshots and shattering glass and felt her car drop as the tires blew out. She estimated there were seven gunshots.[2]

At the time, Mrs. Cummings and her husband were on the hotel patio. They had come from Texas to drop off their son for his induction into the United States Naval Academy. They met up with other parents who were also dropping off their children for

_____

[2] The motive behind the shooting is unknown to us.

induction into the Academy. As the parents stood from their seats, they heard the gunshots. A single bullet fatally struck Mrs. Cummings in her chest.

Shortly after, the police were dispatched to the hotel and the residential parking lot on Pleasant Street. They found shell casings near the car that were later determined to be shot from two firearms.

### Surveillance Videos

The investigation focused on two neighborhoods. The first was the neighborhood where the shooting took place near the Graduate Hotel. This small, condensed neighborhood comprises Obery Court, Clay Street, West Washington Street, and Pleasant Street. The second neighborhood was the nearby Robinwood community, where one suspect went after the shooting.

There were over a hundred surveillance cameras between the two neighborhoods. Maps of the neighborhoods were admitted into evidence, showing the locations of the cameras by number and direction each camera was facing.

A team of investigators gathered and reviewed surveillance videos from these neighborhoods. Investigator Timothy Hall downloaded videos from about 110 cameras, amounting to hundreds of hours of raw footage around the time of the shooting. These videos were admitted into evidence without objection and were contained in about 30 video exhibits.

Lieutenant Michael McDonald was one of the investigators who reviewed the downloaded surveillance footage. He examined 25 to 35 hours of video and found footage

depicting the shooting at about 12:17 a.m. He then worked backward and forward from that point in time to determine the suspects' movements before and after the shooting.

Over objection, Lieutenant McDonald testified that he focused on one of the suspects who wore distinctive attire. The clothing was a black sweatsuit with a white "Keys to Success" logo on the thigh and front of the sweatshirt. He used this as an identifying marker to track the suspect's movements in the neighborhoods by switching between cameras and noting anything of evidentiary value. Based on his knowledge of the area and the camera locations, Lieutenant McDonald identified relevant portions of footage, the camera numbers, their locations, and the times captured.

### Composite Video

John Foster, a demonstrative evidence specialist with the State's Attorney's Office, took the original footage and prepared a 40-minute composite video. He isolated clips from the original videos that investigators had identified as having evidentiary value and assembled them in a video-editing software application, where he fine-tuned the clips and mastered the final composite. He inserted two zoomed-in clips, one scaled up to 200 or 220 percent and another enlarged to about 125 percent, without altering their contents.

The composite video showed a man wearing a distinctive black sweatsuit on Clay Street at 10:42 p.m. before the shooting; on Pleasant Street at 12:17 a.m. when the shooting occurred; and in the Robinwood neighborhood, where he was seen exiting a cab at 12:30 a.m. The court admitted the composite video over objection.

Detective Aaron Stein, who had served with the Annapolis Police Department for over six years, was familiar with the neighborhood near the hotel. After the shooting,

Detective Stein went to the hotel and Pleasant Street to investigate. He helped collect footage from local businesses and reviewed footage gathered by the team.

The State asked Detective Stein to review the composite video during his testimony. He used the two neighborhood maps to guide the jury through the clips of the composite video because they were "sometimes difficult to follow[.]" Over various objections, he explained the relationship between the different clips in the composite video and identified the camera numbers, times, streets, and specific activities depicted in the clips. He conveyed that the clips in the composite video were chronological.

**Arrest**

Law enforcement circulated images of the suspects captured from surveillance footage. Certain officers recognized the appellant as wearing the distinctive black sweatsuit. One advised the detectives that the appellant had an active warrant. Within 24 hours of the shooting, a surveillance team was set up in the Robinwood community, where the appellant was known to frequent. During this surveillance, the appellant was seen walking out of the community with a group and heading towards a gas station.

While wearing a body camera, Officer Edward Cooper responded to the gas station and recorded his interaction with the appellant in the convenience store. Officer Cooper informed the appellant that he had a warrant, which the appellant denied. When Officer Cooper tried to arrest the appellant, the appellant pushed him away and fled the store towards the wooded fence line of the Robinwood community.

After a brief foot pursuit, the police apprehended the appellant. The appellant "was very excited," upset, and in a state of panic. He cursed and screamed while officers tried to

calm him down. The appellant repeatedly yelled about his belongings, including his cell phone. He yelled for his acquaintances to get his phone and demanded that the police give his phone to his acquaintances. Upon arrest, the police mentioned the recovery of "CDS" and collected his phone, a digital scale, and currency from his person. The police also recovered the appellant's dark tennis shoes with a pink Nike logo and white soles, which appeared to match those worn by the man in the distinctive black sweatsuit captured on video surveillance the previous night. Officer Cooper's body camera footage was admitted over objection.

### Appellant's Cell Phone

The appellant's cell phone contained information that linked him to the shooting. A forensic expert who analyzed the appellant's cellular records concluded that the phone activity between 10:00 p.m. and 12:20 a.m. around the time of the shooting placed the phone near the Graduate Hotel.

The phone records showed that an outgoing call was made to a local cab company at 12:10 a.m., about seven minutes before the shooting. The cab driver testified that he was dispatched to Obery Court around the same time. Another outgoing call was made to the cab company at 12:20 a.m., a few minutes after the shooting. The cab driver confirmed that he arrived at Obery Court and picked up two men who instructed him to drive to "Robinwood." The cell site analysis corroborated that the appellant's phone was in the Robinwood area by 12:59 a.m.

The phone records also showed that the appellant had communicated with Hidea Johnson, who lived on the same block on Pleasant Street where the shooting occurred. Ms.

6

Johnson, who had had the appellant's cell phone in her house, returned the phone to the appellant just past midnight on June 29, 2021. Then, minutes after the shooting, the appellant made an outgoing call to Ms. Johnson at 12:28 a.m. At 1:58 a.m., while the police were still processing the scene, the appellant sent a text message to Ms. Johnson asking if "[t]hey still out there?" to which Ms. Johnson replied, "Yeah."

### "Keys to Success"

The investigation tied the distinctive black sweatsuit to the appellant. On July 12, 2021, the police executed a search warrant at a house where the appellant was known to reside. During the search, the police found a black sweatshirt and sweatpants with a white "Keys to Success" logo.

Separately, the police discovered, on his phone and social media account, photographs of the appellant wearing black clothing with a white "Keys to Success" logo.

In a recorded jail call, the appellant spoke to his girlfriend, Arianna Johnson. She informed him that the police had taken his clothes with "the Keys to Success or something." She said that the police had seen the appellant on video and commented, "[T]his will be seen in the video or something[.]" The appellant expressed frustration about the police taking his clothes.

The clothes were submitted for DNA testing, and the results showed that the DNA profile matched the appellant's DNA profile. Gunshot residue particles were found on the clothes recovered from the search and shoes that the appellant wore at the time of the arrest.

**Verdict & Sentencing**

After an eleven-day trial in November and December 2022, the jury found the appellant guilty of first- and second-degree murder of Mrs. Cummings, two counts of attempted first-degree murder along with two counts of conspiracy to commit first-degree murder of Ms. Barnes and Mr. Atwell, and various firearm offenses. The appellant was sentenced to a term of life incarceration, to be served without parole, and a consecutive term of life plus ninety years.

We shall include additional facts as necessary in the discussion.

## DISCUSSION

## I. CONSCIOUSNESS OF GUILT EVIDENCE

### A. Background

On the third day of trial, the appellant objected to the admission of Officer Cooper's body camera footage showing his reaction to his arrest because the arrest was based on open warrants unrelated to the shooting. The appellant had not been charged with murder at the time, and there was no warrant for murder. Because his reaction was attributed to unrelated warrants of which he claimed to be aware[3] and not the shooting, the body camera footage was inadmissible as irrelevant.

The State argued that the reason for the way he reacted to the arrest was a question for the jury to resolve. The State explained that the information on the appellant's cell phone linked him to the shooting, and his objections to its recovery by the police were

---

[3] During the trial, no evidence established that the appellant knew of any outstanding warrants.

"highly reflective" of consciousness of guilt for the shooting. The defense disagreed, maintaining that his statements about his phone related to his "background" in drug activity rather than the shooting. The outstanding warrants were the reason he fled from the police.

The court concluded that the body camera footage was admissible. But it gave the appellant the choice of including the part where the police mentioned the recovery of "CDS" (controlled dangerous substances) from his person, as it could serve as an alternative explanation for the appellant's reaction to the arrest. The appellant chose to include that part and did not object to informing the jury about unrelated criminal conduct referenced in the body camera footage (a warrant and CDS). He also chose to include another part where an officer mentioned that the appellant had "been drinking tonight. That's not making it any better."

The court directed the State to redact the profane language used by the appellant in the body camera footage. The next day, the defense acknowledged that the State had made the redactions, but it argued, "I just feel as though the inflammatory nature of the video outweighs the probative value," and "the depiction, or the verbiage is such that it magnifies the prejudice. And that's why I, we object." The court admitted the redacted video over objection, stating that although the footage still contained offensive language, its content was more probative than prejudicial.

## B. Parties' Contentions

The appellant argues that the circuit court abused its discretion by admitting Officer Cooper's body camera footage showing the appellant's behavior at the time of the arrest. First, he contends that the evidence was not relevant because there were other known

9

reasons, aside from the shooting, for protesting his arrest. Second, he argues that the admission of such evidence was unduly prejudicial because he faced the "cruel dilemma" of either leaving his reaction unexplained or admitting to the jury other contemporaneous criminal conduct (his open misdemeanor warrants and involvement in drug distribution) to explain his reaction to his arrest.

The State responds that the defense did not preserve the second argument. The defense never argued that the evidence should be excluded because alternative explanations of unrelated criminal conduct would be unfairly prejudicial—instead, the claim of undue prejudice related to the appellant's "verbiage" during the apprehension.

As to the first argument, the State maintains that the court rightly concluded that the appellant's behavior at the time of arrest was relevant because it had some tendency to suggest consciousness of guilt for the shooting. Thus, the court soundly exercised its discretion in weighing the probative value against the danger of unfair prejudice claimed at trial.

### C. Relevant Law

Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Relevant evidence is generally admissible. *See* Md. Rule 5-402. But a trial court may exclude otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice[.]" Md. Rule 5-403. "An appellate court reviews without deference a trial court's conclusion as to whether evidence is relevant." *Ford v. State*, 462 Md. 3, 46 (2018) (citation omitted). "An

appellate court reviews for abuse of discretion a trial court's determination as to whether evidence is inadmissible under Maryland Rule 5-403." *Id.* (citation omitted).

"A person's behavior after the commission of a crime may be admissible as circumstantial evidence from which guilt may be inferred." *Thomas v. State*, 372 Md. 342, 351 (2002). If relevant, such circumstantial evidence may be admissible under Rule 5-403, "not as conclusive evidence of guilt, but as a circumstance tending to show a consciousness of guilt." *Snyder v. State*, 361 Md. 580, 593 (2000). "Conduct typically argued to show consciousness of guilt includes flight after a crime, escape from confinement, use of a false name, and destruction or concealment of evidence." *Thomas*, 372 Md. at 351 (citations omitted).

"Applying our accepted test of relevancy, guilty behavior should be admissible to prove guilt if we can say that the fact that the accused behaved in a particular way renders more probable the fact of their guilt." *Id*. at 352 (cleaned up). The probative value of guilty behavior depends on the degree of confidence with which four inferences may be drawn:

> (1) from the defendant's behavior to flight; (2) from flight to consciousness of guilt; (3) from consciousness of guilt to consciousness of guilt *concerning the crime charged*; and (4) from consciousness of guilt concerning the crime charged to actual guilt of the crime charged.

*Id.* (citation omitted and emphasis added). Often, the third inference is challenged.

In some cases, a defendant's behavior has been held to be "too ambiguous and equivocal to be admissible as evidence of consciousness of guilt[.]" *Ford*, 462 Md. at 48–49 (citation omitted). At the same time, the Supreme Court of Maryland has emphasized that "to be relevant, it is not necessary that evidence of this nature conclusively establish

11

guilt. The proper inquiry is whether the evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt." *Id*. at 50 (cleaned up). Just because there may be "some innocent, or alternate, explanation for the conduct does not mean that the proffered evidence is *per se* inadmissible." *Id.* (citations and quotations omitted). Rather, it is "merely to be considered by the jury in weighing the effect of such flight." *Id*. at 47 (citation omitted). Various cases illustrate these concepts and are pertinent to our later discussion.

### i. *Bedford v. State*

In *Bedford v. State*, 317 Md. 659 (1989), the defendant was incarcerated pending a murder trial. During a strip search, officers found a four-inch piece of metal wire sharpened to a point inside his clothing. *Id.* at 664. The State sought to introduce the evidence as an attempt to escape confinement, tending to show his consciousness of guilt for the murder. *Id*. Over objection, the trial court admitted the evidence, but the Supreme Court of Maryland reversed. *Id.* at 668.

The Court concluded that the prejudice of admitting the evidence outweighed its probative value because it was too equivocal to show consciousness of guilt for the murder. It explained:

> [C]onsciousness of guilt is generally circumstantial and should be more probative on the issue of ultimate guilt than prejudicial to the defendant. If the judge finds that the proposed material is likely to lead a reasonable jury to infer the defendant's guilt without causing him substantial prejudice, then the judge may allow the jury to consider the evidence in reaching a verdict as to the charged offense. *If, however, the inference as to ultimate guilt is weak and the circumstantial evidence merely tends to create in the minds of jurors the impression that the defendant is of questionable character and has*

*a propensity for bad acts and probably acted accordingly on the charged occasion, then the evidence should be excluded.*

We are not convinced that possession of a wire under the circumstances in this case is a "substantial step" toward making an escape. *There are too many other possible reasons why Bedford could have been in possession of that wire.* While we doubt that the wire would be a tool for intra-prison work activity, we do accept that its presence could lead the jury to other inferences about Bedford. *The jury could consider it as a weapon and view Bedford as being violent, or could see defendant's possession of the wire as a breaking of rules. Consequently, it could view Bedford as a "bad man" for breaking such a rule.*

*Because the possession of the wire is so equivocal*, we hold that its admission into evidence was more prejudicial to Bedford than probative of an intent to escape and should have been excluded. It was reversible error to admit this evidence.

*Id.* at 667–68 (citations omitted and emphasis added); *see also Snyder*, 361 Md. at 596, 601 ("evidence that the defendant failed to call the police to inquire about the status of the investigation, even for seven years, [was] too ambiguous and equivocal to support" an inference of consciousness of guilt for the crime charged; his silence or failure to inquire had only slight probative value, but its prejudicial effect is significant and unfair).

### ii. *Thomas I and II*

In *Thomas v. State*, 372 Md. 342 (2002) ("*Thomas I*"), the Supreme Court of Maryland addressed whether the trial court erred in admitting as evidence of consciousness of guilt the fact that Thomas resisted when pursuant to a search warrant, the police sought to obtain a sample of his blood more than three years after the murder. *Id.* at 344. The defendant read the warrant but refused to submit to the blood test and was restrained by force to obtain the blood sample. *Id.* at 346. Thomas argued that such evidence was

inadmissible as irrelevant because his conduct was susceptible to many possible innocent explanations. *Id.* at 349.

The Court concluded that the third inference (from consciousness of guilt to consciousness of guilt concerning the crime charged) was not satisfied. *Id*. at 356–57. It explained that "[k]nowledge that the person is suspected of the charged crime is important because the value of the conduct lies in the culprit's knowledge that he or she has committed the charged offense and in his or her fear of apprehension."[4] *Id*. at 354. The State presented no evidence, either direct or circumstantial, that Thomas knew the police wanted to test his blood in connection with the murder for which he was on trial. *Id.* at 357. Thus, the jury should not have been permitted to infer guilt from the defendant's conduct. *Id.* at 358.

The State retried the case, this time offering testimony that the detective had advised the defendant that the warrant and blood test were "in reference" to the murder for which he was on trial. *Thomas v. State*, 397 Md. 557, 576–77 (2007) ("*Thomas II*"). On appeal, the Supreme Court of Maryland held that Thomas's refusal to submit to a blood test was admissible as evidence of consciousness of guilt; it was relevant because it "*could* support

---

[4] The Court noted:

> *We do not suggest that merely because the evidence may show that a defendant also has committed other crimes there is a basis to exclude the evidence.* The point is that the evidence must at least be connected to the crime charged.

*Id.* at 354 n.3 (emphasis added). Although not applicable in *Thomas I*, the footnote anticipated a circumstance present in this case, as discussed later.

an inference that the defendant's conduct demonstrates a consciousness of guilt." *Id*. at 577 (citation omitted).

The Court rejected Thomas's contention that his refusal to submit to the blood test could have been due to an innocent explanation. *Id*. at 577. The Court stated, "[s]o long as the proper foundation is laid, consciousness of guilt evidence may be relevant and admissible." *Id*. at 578. And if there was an innocent explanation for his conduct, "it was incumbent upon him to generate that issue." *Id*. Thomas failed to offer such an alternative theory at trial. *Id.*

### iii. Ford v. State

In *Ford v. State*, 462 Md. 3 (2018), evidence was adduced that, after stabbing the victim, Ford fled to his ex-girlfriend's home. *Id.* at 8. The morning after the stabbing, the ex-girlfriend asked Ford to leave. *Id.* Ford cursed at her, slammed the front door, and left. *Id*. The trial court admitted evidence of his reaction to being told that he had to go as evidence of consciousness of guilt for the stabbing. *Id.*

Ford argued that such evidence was too ambiguous and equivocal to constitute evidence of consciousness of guilt. *Id.* at 45. The evidence was susceptible to multiple prejudicial interpretations, such as his character trait of hot-temperedness or aggressiveness, which might lead the jury to infer that he acted in conformity with that trait when he stabbed the victim. *Id.* He also claimed that innocent explanations for his reaction rendered the evidence inadmissible. *See id.* at 46. The Court was not persuaded by either argument.

The Court concluded that Ford's behavior satisfied the inferential chain for admission of post-crime conduct as evidence of consciousness of guilt for the shooting. *Id*. at 51–52. The Court held that his reaction to the ex-girlfriend's request to leave her home was relevant in showing Ford's state of mind about the stabbing. *Id*. at 51. It was circumstantial evidence tending to show that he wanted to evade law enforcement because he was guilty. *Id*. The possibility of an innocent explanation for his reaction did not render the ex-girlfriend's testimony inadmissible. *Id*. at 52. Because the evidence of the defendant's conduct *could* support an inference of consciousness of guilt, the evidence was relevant and admissible. *See id*. at 52–53 (citing *Thomas II*, 397 Md. at 577).

In weighing the probative value against the danger of unfair prejudice, the Court was not persuaded by Ford's contention that evidence of his hot-temperedness or aggressiveness would be perceived as his acting in conformity with the stabbing. *Ford*, 462 Md. at 57–58. There were innocent explanations that Ford could have offered to explain his reaction to being told to leave (that he had not taken his daily medication or was hurt from the break-up of his romantic relationship), but he did not do so. *Id*. at 58. In any event, his reaction did not demonstrate that he was violent or assaultive, only that he was upset about being asked to leave his hiding place. *Id*.

### D. Analysis

We agree that the appellant's second argument about undue prejudice was not preserved. At trial, the appellant objected to the admissibility of Officer Cooper's body camera footage because it was irrelevant. The claim of unfair prejudice was constrained to the "inflammatory nature of the video" and its "depiction, or verbiage," which the court

16

understood related to the appellant's use of profane language (an objection that is not being pursued on appeal). The defense did not claim that the evidence was unfairly prejudicial because it would require the appellant to reveal other criminal conduct to explain his reaction to the arrest, as he now does on appeal. Thus, the appellant's second argument about undue prejudice was not preserved. *See* Md. Rules 8-131(a) and 4-323(a); *Jeffries v. State*, 113 Md. App. 322, 341–42 (1997) (appellate argument that evidence was unduly prejudicial was not preserved where objection below was only that evidence was irrelevant); *Klauenberg v. State*, 355 Md. 528, 541 (1999) ("It is well-settled that when specific grounds are given at trial for an objection, the party objecting will be held to those grounds and ordinarily waives any grounds not specified that are later raised on appeal.").

As to relevancy, the appellant challenges the third inference in the chain of required inferences, *supra*. He argues that the State failed to establish consciousness of guilt for the shooting because of other known motivators. We disagree and hold that the third inference was satisfied. To contextualize our reasoning, we first address the appellant's contentions.

i.  *Appellant's Reliance on Thompson v. State*

Relying on *Thompson v. State*, 393 Md. 291 (2006), the appellant claims that because other criminal conduct provided alternate, equally reasonable inferences for his reaction to the arrest, the evidence of his behavior was rendered irrelevant. Since the alternative explanations were known to all parties and the court, they undermined the confidence with which the third inference could be drawn. Thus, the body camera footage showing his reaction to the arrest was inadmissible as irrelevant.

In *Thompson*, the Supreme Court of Maryland held that the trial court abused its discretion in giving the jury a flight instruction. *Thompson*, 393 Md. at 315. There, a detective investigating a shooting saw Thompson, who matched the description of the shooter, on a bicycle. *Id*. at 294. The detective identified himself as an officer and yelled for Thompson to stop. *Id.* Thompson saw the detective and pedaled away. *Id.* When Thompson was apprehended shortly after, officers recovered a large amount of crack cocaine on his person. *Id.* Before trial, the trial court suppressed evidence of the cocaine, the results of a chemical analysis, and Thompson's statements to officers concerning his possession of the drugs as inadmissible. *Id.* at 295.

The Court held that the flight instruction given to the jury was improper and misleading. *Id.* at 315. This was because the only other explanation for Thompson's flight, which was known to both parties, was not shared with the jury as it was highly prejudicial:

> The gravamen of the issue is whether Mr. Thompson fled in an attempt to avoid apprehension for the crimes for which he was on trial. In the present case, the jury was not presented with evidence of what may have been an alternative and at least a cogent motive for Mr. Thompson's flight, specifically that drugs were found on his person. During his interview with police, Mr. Thompson asserted that he ran from them because he had [86 vials of crack cocaine] in his possession[.] *We find that this fact, which was known to all parties involved although not revealed to the jury, undermines the confidence by which the inference could be drawn that Mr. Thompson's flight was motivated by a consciousness of guilt with respect to the crimes for which he was on trial in the present case*; it provides a foundation for the alternate, and equally reasonable, inference that Mr. Thompson fled due to the cocaine in his possession, an action a person in his position may have taken irrespective of whether he also shot and attempted to rob [the victim]. Mr. Thompson thus was placed in a difficult situation where he must either not object to the highly prejudicial evidence concerning his possession of a significant amount of cocaine being introduced to the jury to explain his flight (or perhaps forced to make a Hobson's choice to introduce such

18

evidence himself), or decline to explain his flight and risk that the jury would not infer an alternative explanation for his flight.

*Id*. at 313–14 (footnotes omitted and emphasis added). The Court further explained:

Where the defendant possesses an innocent explanation that does not risk prejudicing the jury against him, it would be expected that the defendant would present his purported reasons for his flight to the jury. *It is error, however, for the trial judge to give such an instruction in a case like the case sub judice where the defendant would be prejudiced by the revelation of the "guilty" explanation for his flight. The circumstances of the case at bar impaired the confidence with which the inference that Mr. Thompson fled from police due to a consciousness of guilt with respect to the crimes charged could be drawn and rendered the instruction misleading as to the existence of an alternative basis for Mr. Thompson's flight from the police.*

*Id.* at 315 (emphasis added).

The appellant construes *Thompson* to mean that if the alternative explanation for a defendant's behavior implicates an unrelated crime, that "criminal motivator" vitiates any connection between the defendant's behavior and the charges for which he is being tried. Thus, the consciousness of guilt evidence would be irrelevant.

The appellant's reliance on *Thompson* is misplaced for two reasons.[5] First, the issue in *Thompson* did not involve the admissibility of evidence, as evidence of the defendant's flight was admitted during trial without objection. *Id.* at 295. *Thompson* involved the propriety of the jury instruction on flight. *See Ford*, 462 Md. at 55–56 (highlighting the material distinction between the evidentiary and instructional issues raised).

---

[5] The appellant relies on the same passage quoted in *Thompson* to support his second argument about undue prejudice. He claims he was forced to present highly prejudicial explanations for his behavior. As stated, we need not address the point because the argument was not preserved.

Second, the language used in *Thompson,* relied on by the appellant, was influenced by the fact that the *only* other explanation for the defendant's flight, which was known to the parties but not to the jury, rendered the jury instruction misleading regarding the existence of an alternate basis for his flight. In contrast, the appellant presented multiple explanations for his reaction to the arrest. Some were criminal (misdemeanor warrants and the discovery of CDS), while others were innocent. For instance, in the body camera footage, an officer mentioned that the appellant had been drinking that night, which the appellant presumably chose not to redact to support an innocent explanation for his behavior during the arrest. Further, during closing argument, defense counsel suggested that the appellant panicked as he was taken into custody because the police were going to take his money and cell phone, and he feared that he would not get them back. The defense also argued to the jury that the appellant panicked because an officer had pointed a gun at him during the apprehension. Thus, the concerns articulated in *Thompson* are not implicated here.

### ii. "Innocent" Versus "Criminal" Motivators

The appellant claims that the relevance of consciousness of guilt evidence depends on whether any alternative explanation for the post-crime behavior is "innocent" or "criminal." If the alternative explanation is innocent, then the post-crime behavior would be admissible because the jury could either infer that the behavior resulted from the crime for which he is being tried or an innocent reason. But if, as here, there are "multiple criminal motivators" for the conduct and nothing to connect the conduct to "one particular crime,"

20

the post-crime conduct is inadmissible because the jury cannot infer that a defendant's flight was motivated by the crime for which he is being tried.[6]

Our appellate courts have not addressed whether consciousness of guilt evidence is rendered irrelevant when the alternative explanation for post-crime conduct is an unrelated warrant or the commission of an unrelated crime. But courts in other jurisdictions have, and their reasoning is instructive.

The Court of Appeals of Virginia in *Ricks v. Commonwealth*, 39 Va. App. 330 (2002), considered evidence of an outstanding warrant and possession of marijuana as alternative explanations for the defendant's flight in a murder trial. The evidence established a nexus between the defendant's flight and the murder for which he was tried. *Id.* at 336. The defendant, however, argued that the trial court erred in admitting evidence of flight because his outstanding warrants and the marijuana found on him were plausible reasons for his flight unrelated to the murder. *Id.*

The Court rejected the argument, explaining:

While appellant argues his flight could have been the result of the outstanding warrants or his possession of marijuana, these potential multiple causes for the flight do not obviate the "consciousness of guilt" nexus with the murder. Although some evidence incidentally disclosed appellant may

---

[6] The appellant claims *Ford*, *Thompson*, and *Bedford* support this principle. He contends that *Ford* "cabined" its decision to circumstances where the alternate explanation is innocent and not criminal; it serves as an example of consciousness of guilt evidence that would be admissible when the alternative explanation is innocent. In contrast, *Thompson* and *Bedford* suggest that consciousness of guilt evidence would be inadmissible when the alternative explanation is criminal. We disagree with the appellant's interpretation of these cases, which we have summarized *supra*. None held or suggested that the *relevance* of consciousness of guilt evidence depends on whether any alternative explanation for post-crime behavior is innocent or criminal.

21

have been guilty of other crimes, the evidence still proved consciousness of guilt related to this homicide.

*Id*. (cleaned up); *accord*, *Commonwealth v. Booker*, 386 Mass. 466, 470–71 (1982) (whether flight was due to outstanding warrant for another crime or for crime being tried was question for the jury; involvement in other criminal activity did not render flight evidence inadmissible); *Fulford v. State*, 221 Ga. 257, 258 (1965) (that officer was about to apprehend defendant 30 days after robbery, even though warrant was for another offense, by no means excluded the reasonable inference that defendant fled to avoid apprehension for robbery; other reasons for flight simply presented a question for jury).

The Court of Appeals of New York in *People v. Yazum*, 13 N.Y.2d 302 (1963), addressed whether multiple criminal motivators unrelated to the charged offense rendered consciousness of guilt evidence inadmissible. There, the conviction for robbery depended in part on testimony that the defendant escaped from custody. *Id.* at 303. The defense argued that the flight evidence was inadmissible because, at the time of the attempted escape, the defendant was also detained under an out-of-state warrant for a parole violation. *Id.* The trial court denied the motion, and the defendant was convicted. *Id.*

On appeal, the appellate division reversed the conviction because it was impossible to tell which, if either, of the charges the inference of guilt should be attributed. *Id.* at 303–04. But the Court of Appeals reversed the appellate division's decision, explaining:

> It is common in cases of attempted flight to find that the defendant is charged with several crimes, or, at the time of flight, was guilty of some other offense, such as [a] parole violation. To require as a matter of law that the admissibility of flight evidence depends on its unequivocal connection with guilt feelings over the particular crime charged would, therefore, operate to exclude such evidence from many cases in which it has always been regarded

22

as admissible as a matter of course. No one disputes the general rule, as stated by Wigmore, that ambiguities or explanations tending to rebut an inference of guilt do not render flight evidence inadmissible but, rather, must be introduced as part of the defense and submitted to the jury. *The suggested distinction would mean that only alternative innocent explanations of the flight are matters of rebuttal within the supposedly general rule, while the special dispensation of absolute exclusion is reserved for those who could show multiple guilt. We think there is obviously no justification for distinguishing in such a manner between an explanation urging that flight was not motivated by consciousness of guilt at all, and one which urges that it was prompted by consciousness of a different guilt. Such a distinction not only lacks support in the principles and theory of evidence, but would create a practical preference in favor of persons who act from guilty reasons over those who act from innocent motives.*

*Id.* at 304–05 (emphasis added and citations omitted); *accord Fulford*, 221 Ga. at 258 ("It would place upon the State an impossible burden to prove that one charged with multiple violations of the law fled solely because of his consciousness that he committed one particular crime. It is better logic to infer that the defendant, who is charged with several offenses, fled because of a conscious knowledge that he is guilty of them all."); *United States v. Boyle,* 675 F.2d 430, 432–33 (1st Cir. 1982) (rejecting argument to exclude alias evidence whenever a defendant has committed more than one crime; "Such a rule would ignore the substantial possibility that the defendant is using the alias to evade detection for all of his crimes, including the one charged.").

We are persuaded by the reasoning of these out-of-state cases in rejecting the contention that the relevance of consciousness of guilt evidence depends on whether any alternative explanation for the post-crime behavior is "innocent" or "criminal." The reasoning in these cases aligns with the longstanding principle established by our appellate courts that the admissibility of consciousness of guilt evidence depends on "whether the

evidence *could* support an inference that the defendant's conduct demonstrates a consciousness of guilt" for the crime charged. *Ford*, 462 Md. at 50 (quoting *Thomas II*, 397 Md. at 577). As the Court noted in *Thomas I*, evidence of consciousness of guilt is not inadmissible "merely because the evidence may show that a defendant also has committed other crimes[.] . . . The point is that the evidence must at least be connected to the crime charged." 372 Md. at 354 n.3.

Adopting the appellant's broad proposal "would mean that only alternative innocent explanations of the flight are matters of rebuttal within the supposedly general rule, while the special dispensation of absolute exclusion is reserved for those who could show multiple guilt"—a proposition that is unsupported by the principles of evidence and would create a practical preference for people "who act from guilty reasons over those who act from innocent motives." *Yazum*, 13 N.Y.2d at 305. Further, the appellant's argument ignores the possibility that the appellant reacted as he did because of all criminal activity— the shooting, the misdemeanor warrants, and involvement in drug distribution. *See Fulford*, 221 Ga. at 258; *Boyle,* 675 F.2d at 432–33.

### *iii. Third Inference*

Against this backdrop, we resume our analysis of the inferential chain, focusing on the third inference at issue (from consciousness of guilt to consciousness of guilt concerning the crimes charged). We hold that the evidence of the appellant's reaction to the arrest satisfied the third inference because it was circumstantial evidence tending to support an inference of his consciousness of guilt for the shooting.

Within 24 hours of the shooting, the police arrested the appellant. The jury could have logically inferred that his reaction to the arrest was to avoid apprehension for the shooting. *See Thomas I*, 372 Md. at 358 n.4 (explaining that the lapse in time between the crime and the attempted flight goes to weight) (citation omitted); *Booker*, 386 Mass. at 471 (police arrested defendant less than 24 hours after robbery; jury could have drawn a logical inference that his concealment from the police was to avoid apprehension for that robbery). In addition, the appellant messaged Ms. Johnson, asking if "they" were "still out there?" at 1:58 a.m. when police were still processing the scene on Pleasant Street. This was circumstantial evidence that the appellant was aware of the shooting. Furthermore, the appellant had his cell phone at the time of arrest, which contained an assortment of information that linked him to the shooting. Based on these facts, the jury could have reasonably inferred that the appellant was attempting to evade capture and prevent authorities from finding evidence that linked him to the shooting.

Contrary to the appellant's assertion otherwise, alternative criminal explanations for his reaction to the arrest did not render the consciousness of guilt evidence irrelevant. It was a question for the jury to determine whether any alternative criminal explanation provoked the appellant's reaction to the arrest. *See Thomas I*, 372 Md. at 354 n.3; *Ford*, 462 Md. at 50; *Yazum*, 13 N.Y.2d at 305; *Fulford*, 221 Ga. at 258; *Booker*, 386 Mass. at 470–71; *Ricks*, 39 Va. App. at 336–37. For the reasons stated, the circuit court did not err in admitting the redacted body camera footage.

## II. COMPOSITE VIDEO AS SUMMARY EVIDENCE

The appellant argues that the circuit court erred in admitting the composite video under Maryland Rule 5-1006 for two reasons. First, the composite video did not serve its essential function under the Rule because the distillation of the volume of source footage pinpointed attention to pertinent parts of the videos that the State had accomplished through testimony and stipulation. Once those pertinent portions were identified, the State could have displayed them readily with a pause button or by using a mouse to isolate attention to those parts. He maintains that the Rule permits using a summary only when the individual aspects cannot be conveniently examined in court or when the facts may be ascertained only via that summary, which was not the case here.

Second, the appellant argues that the composite video cannot be considered a "summary" because it lacks the objectivity of an abridgment, brief, compendium, or digest as suggested in the dictionary definition. Rather than being an objective condensation or contraction of the voluminous raw data, the composite video was a selection of source videos that the State wanted to focus on. The State chose video clips, zoomed in on specific clips, placed them side-by-side (at times substituting one camera for another), and put them in the desired order so that the State's witnesses could describe the sequence of events to support the State's theory of prosecution. Because the composite video was a "cultivated production" rather than a "summary," it should have been excluded under the Rule.

The State responds that the composite video was properly admitted as a summary under Rule 5-1006 because the source videos—which amount to hundreds of hours of raw footage captured by over a hundred cameras—could not have been conveniently examined

in court. The State further argues that the appellant's characterizations of the composite video are vague and not substantively explained. The video displayed the series of clips chronologically, and there is no assertion that a critical clip was missing or that a particular clip should have been omitted.

### A.  Maryland Rule 5-1006

When evidence would be admissible "but is so voluminous as to make it impractical its admission on an item by item basis, proof may be made in summary form by a qualified witness." 6A Lynn McClain, *Maryland Evidence State and Federal* § 1006:1(a) (Sept. 2023 update) ("McClain"). Maryland Rule 5-1006 provides:[7]

> The contents of voluminous writings, recordings, or photographs, otherwise admissible, which cannot conveniently be examined in court may be presented in the form of a chart, calculation, or other summary. The party intending to use such a summary must give timely notice to all parties of the intention to use the summary and shall make the summary and the originals or duplicates from which the summary is compiled available for inspection and copying by other parties at a reasonable time and place. The court may order that they be produced in court.

The prerequisites to admit summary evidence under Rule 5-1006 can be condensed into four. *First*, the source materials must be sufficiently voluminous. *See O'Donnell v. State*, 188 Md. 693, 697 (1947) ("where the books from which certain items are desired to be offered in evidence are large records, a compilation properly made from those records is admissible."). "There is no precise test for determining when source materials may be

---

[7] Rule 5-1006 is derived from Federal Rule of Evidence 1006. Because Rule 5-1006 largely tracks the federal counterpart, we look to the federal courts, and their interpretation of federal rule, for guidance in interpreting our own rule. *See Garay v. Overholtzer*, 332 Md. 339, 355 (1993).

considered voluminous." 31 Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 8044 (April 2023 update) ("Wright & Miller"). "The key is whether they are so numerous that they 'cannot be conveniently examined in court.'" *Id*. "[T]he convenience standard does not require a showing that the source material is so voluminous that the material is impossible for the jury to examine and understand." *Id.* "Instead, the convenience standard is satisfied where, even though it is possible for the jury to digest the source material, appreciable time and effort can be saved by admitting summary evidence." *Id*.

Two interrelated factors affect when source materials are so voluminous that they cannot conveniently be examined in court: the quantity and complexity of the materials. *Id*.

> Where the source materials are large in number or length, examining them in court may take an excessive amount of time and strain the jury's ability to compile and recall the contents. The same is true where the contents of those materials are complex or otherwise difficult to understand. Of course, quantity and complexity are relative concepts, not absolutes. . . . [T]hese factors are in a dynamic relationship. For example, as quantity or complexity of the source materials increases, relatively less is required with respect to the other factor.

*Id.* (footnotes omitted). "The trial judge has substantial discretion to decide whether the underlying originals are too voluminous to be conveniently examined in court." 2 Kenneth S. Broun et al., *McCormick on Evidence* § 241 (July 2022 update) ("McCormick").

*Second*, while the underlying writings, recordings, or photographs need not be introduced into evidence, they must still be "otherwise admissible." *Davies v. State*, 198 Md. App. 400, 413 (2011) (error to admit summary evidence where source materials were

not shown to fall within exceptions to hearsay rule, and underlying charts prepared by non-testifying witnesses were testimonial hearsay). This is because a summary contemplated by Maryland Rule 5-1006 is being introduced substantively in place of the matters summarized. *See* McClain § 1006:1(a); McCormick, § 241.

*Third*, the proponent must give timely notice of its intent to use summary evidence. This allows the opponent to be prepared to evaluate its accuracy. *See* McClain § 1006:1(a). 5 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 10:35 (Aug. 2023 update) ("Mueller & Kirkpatrick") ("[T]he required time should depend on the bulk and complexity of the material and the ease or difficulty that examination would entail.").

*Fourth*, the party seeking to introduce the summary must make both the summary and the underlying documents available for inspection and copying by the other parties at a "reasonable time and place." *See, e.g.*, *Davies*, 198 Md. App. at 414 (error to admit summary evidence where various documents used to create the summary were not made available to defendant for inspection and copying). This requirement permits the opponent "to check the summary for any errors or inconsistencies and for purposes of cross-examination." McCormick § 241.

The trial court "may" require producing the underlying documents in court. "The purpose of this is to make sure that the evidence is available in the courtroom to be offered into evidence or used during cross-examination of the witness through whom summary evidence is introduced." Wright & Miller § 8045 (footnote omitted); *see* Mueller & Kirkpatrick § 10:35 (a trial judge may order production of material in court if it is "reasonably compact, or critical to the litigation and subject to dispute on matters of detail,

29

or if there is reason to suspect the objectivity of the summary[.]"). That said, such production in court should be avoided if it is too impractical. McClain § 1006:1(a).

## B. Analysis

The appellant does not challenge the second, third, and fourth prerequisites. Instead, his arguments implicate the first prerequisite and whether the composite video constitutes a "summary" under the Rule.

We hold that the first prerequisite was met. The trial record established that the source materials amounted to hundreds of hours of original footage. The appellant's assertions that the prosecution could have played and paused for the jury relevant clips from the original videos and that those clips had already been identified through testimony or stipulation overlook the fact that the jury would have been left with the original videos contained in about 30 video exhibits to sift through during deliberation. While it would have been possible for the jury to go through each video exhibit and search for relevant clips identified by the witnesses, we cannot say it would have been convenient. We can imagine how appreciable time would have been saved by admitting the composite video as summary evidence. Thus, the convenience standard under the first prerequisite was satisfied. *See* Wright & Miller § 8044; *O'Donnell*, 188 Md. at 698.

We are also unpersuaded by the appellant's argument that the composite video is not a "summary." Rule 5-1006 applies to materials in the form of "writings, recordings, or photographs." "Writings" and "recordings" consist of "letters, words, numbers, or their equivalent, set down by handwriting, typewriting, printing, photostating, photographing, magnetic or optical impulse, mechanical or *electronic recording*, or other form of data

compilation." Md. Rule 5-1001(a) (emphasis added). "Photographs" "include still photographs, X-ray films, *video tapes, and motion pictures*." Md. Rule 5-1001(b) (emphasis added).

Under Rule 5-1006, the source materials can be presented as a "chart, calculation, *or other summary*." (Emphasis added). If the source materials are videotapes, logically, summary evidence can take the same form. Indeed, composite audio and video recordings have long been considered summary evidence by courts in other jurisdictions. *See Commonwealth v. Suarez*, 95 Mass. App. 562, 571–72 (2019) (upholding admission of surveillance footage summary as summary evidence); *United States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994) (upholding admission of composite tapes as summary evidence); *United States v. Bakker*, 925 F.2d 728, 736–37 (4th Cir. 1991) (eleven composite tapes edited from over 200 hours of broadcasts admissible as summary evidence); *United States v. Rengifo*, 789 F.2d 975, 979 n.3 (1st Cir. 1986) (recognizing that the court has long upheld the use of composite tapes as evidence) (collecting cases); *United States v. Denton*, 556 F.2d 811, 816 (6th Cir. 1977) (composite tape prepared by agents admissible as summary evidence).

The core of the appellant's arguments is that the composite video purportedly favored the State's theory of the case. Significantly, the appellant does not claim that the composite video is inaccurate, omits essential aspects of the source footage, or adds parts that were not in the original footage. *See Suarez*, 95 Mass. App at 572 (rejecting vague complaints that summary video did not fairly summarize the relevant footage).

31

The State's use of the composite video to support its theory of the case does not disqualify it from being a "summary" under the Rule. Nor does its purported one-sidedness justify exclusion. This is because "summary evidence necessarily involves selecting some things and leaving out others[.]" Mueller & Kirkpatrick § 10:34. It "necessarily . . . involves interpreting and drawing conclusions" because "these processes are inherent in the task of condensing a mass of material into a form that is shorter and more readily understandable." *Id.* "So long as they are accurate . . . such summaries may present only one party's side of the case." McCormick § 241; *see also Badgett v. Rent-Way, Inc.*, 350 F. Supp. 2d 642, 651 n.4 (W.D. Pa. 2004) ("the selective nature" of the information contained in the summary chart was not a basis for exclusion because summaries under the federal rule are "necessarily selective compilations of relevant information created for litigation purposes; indeed, that is the very reason[] for their existence.").

To the extent the appellant claims that the composite video presented a biased version of the events, any potential bias goes to the weight of the summary evidence and not admissibility. *See DuBay v. King*, 844 F. App'x 257, 263 (11th Cir. 2021) ("To the extent DuBay contends that Furth's summaries were affected by bias, the district court correctly observed that Furth's potential bias goes to the weight the district court should give the summaries—not whether they are admissible."); *United States v. Lynch*, 735 F. App'x 780, 786 (3d Cir. 2018) (that summary did not include all the related accounts does not undermine its admissibility because it accurately reflected the accounts it did include). We do not interpret the rule to require a party to include their adversary's version of the

facts in their summary exhibit. *See United States v. Swanquist*, 161 F.3d 1064, 1072–73 (7th Cir. 1998).

Moreover, the appellant had the opportunity to cross-examine the witnesses and present any arguments to the jury regarding potential misleading impressions caused by the composite video. The defense indeed availed itself of both opportunities. *See United States v. Kilpatrick*, 798 F.3d 365, 383 (6th Cir. 2015) ("[B]ecause the defendants had access to all the evidence cited by the agents, they were free to challenge the accuracy of any summary testimony through cross-examination."); *United States v. Sawyer*, 85 F.3d 713, 740 (1st Cir. 1996) (no error in admitting summaries that did not depict full range of expenditures; defendant had opportunity to cross-examine to place summaries within context of total financial activity and explore any misleading impressions that he claims the summaries created). For the reasons stated, the court did not err in admitting the composite video.

## III.   NARRATION OF VIDEOS

The appellant argues that the trial court erred in allowing Lieutenant McDonald and Detective Stein to narrate portions of the video evidence.[8] He argues that the narration was

---

[8] Some of the challenged testimony from Lieutenant McDonald included: describing a person in "a black sweatsuit with distinctive white logo" getting out of a particular vehicle and interacting with others; describing that person's travel and interactions with others; describing the travels of "the same Trailblazer that was – ended up later, that was shot at the end of Pleasant Street during the course of this incident," including the actions of those who alighted from that vehicle; describing the person in the distinctive sweatshirt jogging toward the car; describing the travels of the man in the sweatshirt and stating that he retrieved a phone from a woman; describing the man in the sweatshirt walking around a set of dumpsters towards the vehicle; describing the "person wearing the black sweatshirt with distinctive design" getting into a taxi accompanied by another person.

33

inadmissible because the investigators were not present during the events as they unfolded. Specifically, the appellant challenges whether the investigators could describe certain vehicles, their movements, and routes of travel and link them to either the victims or the shooters. Additionally, he challenges the detectives' ability to describe their observations of where the person wearing the "distinctive black sweatshirt" went and what he did, as well as the movements of the Trailblazer and the actions of its occupants.

The State responds that the court properly exercised its discretion in allowing the detectives to contextualize the sequence of clips in the summary exhibit based on their personal knowledge of the local geography and locations of various cameras. It added that any testimonial errors exceeding what was allowed would have been harmless given the circumstances of the case. We agree with the State.

## A. Analysis

Maryland Rule 5-701 provides:

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

"The rationale for the standard set by Rule 5-701 is two-fold: the evidence must be probative; in order to be probative, the evidence must be rationally based and premised on the personal knowledge of the witness." *State v. Payne*, 440 Md. 680, 698 (2014). "While

---

Some of the challenged testimony from Detective Stein included describing "Breonna Barnes and R.J. [Atwell] . . . coming into the neighborhood in that Chevy Trailblazer" and "that individuals with the distinctive logo . . . stepping onto the sidewalk, going the same way as the Trailblazer[.]"

a witness may proffer narrative testimony within the permissible confines of the rules of evidence, we have held he may not 'interpret' audio or video evidence, as such testimony invades the province of the jury, whose job is to make determinations of fact based upon the evidence." *Paige v. State*, 226 Md. App. 93, 129 (2015) (citation omitted). Admission of lay opinion evidence under this rule is subject to an abuse of discretion standard. *Id.* at 124.

We hold that the circuit court did not abuse its discretion in allowing the detectives to testify about what they saw in the videos. Lieutenant McDonald, who was familiar with the community and the camera locations, pointed out aspects of the source videos that were relevant to the investigation. Detective Stein, who was experienced working in the area and investigated the shooting, explained how the clips in the composite video related chronologically to each other in the context of the geography depicted on the neighborhood maps. Although neither detective witnessed the events as they unfolded, their knowledge of the area and camera locations provided a foundation for them to describe what they saw on the videos in a way that helped the jury understand the evidence without intruding into its exclusive realm.

The detectives' testimony established the chronology of events, the suspects' movements before and after the shooting, and the significance of the black sweatsuit with the white "Keys to Success" logo found later. All this was helpful to the jury in understanding the events depicted in the videos, how the composite video was prepared, and how the video evidence related to other evidence presented at trial. Furthermore, the jury saw the composite video, which was admitted along with the source videos. It could

have judged whether the detectives' perceptions of movements and descriptions of individuals were accurate. *See Tobias v. State*, 37 Md. App. 605, 616–17 (1977) ("We find no abuse of discretion in allowing the authenticating witness to identify the people shown in the video tape . . . The jury saw the tape, and could judge for itself what it showed and whether [the detective's] identifications were accurate"). The court, therefore, did not abuse its discretion in allowing the detectives to describe what they saw in the video evidence.[9]

Even if we had been persuaded that the court erred, we conclude that the detectives' description of what they saw in the video evidence was harmless. *See Dorsey v. State*, 276 Md. 638, 659 (1976) (the harmless error standard requires a showing that the error was harmless beyond a reasonable doubt and did not influence the outcome of the case). Not only was the jury free to view the videos themselves and judge the accuracy of the detectives' descriptions, but other witnesses identified the appellant in specific footage as the person wearing the distinctive black sweatsuit. There is no dispute that the shooting was captured on video, nor was it disputed that the person seen firing the gun was wearing a distinctive black sweatsuit.

Moreover, the black clothing with the white "Keys to Success" logo, matching the distinctive black sweatsuit seen in the surveillance footage, was found where the appellant

---

[9] The appellant directs our attention to *Payton v. State*, 235 Md. App. 524, 540 (2018) which states, in dicta, that "[a]s a general rule [under Rule 5-701], caution should be exercised by the trial court when determining whether to permit a police officer to narrate a video when the officer was not present during the events depicted therein." Based on our review of the trial record, we are satisfied that the court did heed this caution.

was known to reside. DNA testing revealed that the appellant's DNA was on that clothing. The shoes recovered from the appellant after his arrest and the clothing recovered from the residence tested positive for gunshot residue. The cell site analysis of the appellant's phone indicated that he was near the hotel at the time of the shooting and later in Robinwood, consistent with the timeframes in the videos. This evidence was corroborated by phone records showing calls to the cab company and the cab driver's testimony. We fail to see how the detectives' descriptions of movements they saw in the video evidence, to the extent they strayed beyond what was permissible, had any discernible effect on the jury's verdict.

**JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**